STATE *vs.* DAVID L. STAIN and OLIVER CROMWELL.

Penobscot. Opinion March 12, 1890.

*New trial. When denied. Rule. Civil and criminal cases. Newly-discovered Evidence.*

In regard to the supervisory power of the court over verdicts, and in relation to the granting of new trials, the same rule should be extended to criminal cases as in civil actions.

Notwithstanding the discretion of the court is very broad in cases where the motion for new trial is based on newly-discovered evidence, and will be exercised whenever a proper case is presented, yet there are well-settled rules by which the court should be governed.

In order to warrant a new trial upon the ground of newly-discovered evidence it should be made to appear that injustice is likely to be done by refusing it; and therefore it becomes necessary for the court to take into consideration the weight and importance of the new evidence, its bearing in connection with the evidence on the former trial, and even the credibility of witnesses.

This rule is applicable not only to civil but criminal cases.

A motion for a new trial should not be granted on the ground of newly-discovered evidence unless the evidence is such as ought to produce on another trial an opposite result upon the merits.

In considering the motion the court will not inquire whether, taking the newly-discovered evidence in connection with that exhibited on the trial, a jury might be induced to give a different verdict, but whether the legitimate effect of such evidence would require a different verdict.

The legitimate effect of the entire body of new evidence in this case, taken in connection with all the other evidence introduced at the trial, is not such as would warrant a jury in arriving at a different conclusion from that already found by them.

ON MOTION.

The defendants were indicted at the February term, 1888, of this court, in Penobscot county, for the murder of John Wilson Barron, treasurer of the Dexter savings bank, on the 22d day of February, 1878. The trial was begun on the twelfth day of term before a drawn jury, the chief justice presiding.

*O. D. Baker,* attorney general, and *F. H. Appleton,* county attorney, appeared for the state, and *L. A. Barker* and *P. H. Gillin,* for the defendants.

The case was committed to the jury on the 23d day when a verdict, guilty of murder in the second degree, was returned.

On the next day, the defendants filed a general motion to set the verdict aside as against evidence, and for a new trial. They also filed, several days later in the term, a second motion for a new trial on the ground of newly-discovered evidence. The latter motion, followed subsequently by others of the same kind, at different intervals, related largely to offers of evidence purporting to show an *alibi* on the part of the defendants; that they were not at Dexter February 22, 1878, but were in Medfield, Mass., their home; also to contradict the evidence of Charles F. Stain, a witness for the prosecution, who testified to having been in the state at certain times with the defendants. A commissioner to take the depositions of witnesses, many of whom resided in Massachusetts, was appointed by the court. To afford time to take this testimony,—the presiding justice having overruled the general motion to set aside the verdict as against evidence and the defendants having appealed to the full court,—by consent of all parties, the appeal was entered and heard at the law term, for the western district held in July following, at Portland. The motion for a new trial based on newly-discovered evidence not being ready for a hearing at *nisi prius,* was not then passed upon by the presiding justice, but was argued and heard upon a report of the evidence before said law term, as a matter to be considered

by it, if belonging to it to decide, otherwise as a matter to be considered and acted upon by the justice sitting at the argument, whose duty it might be to pass upon the same. An entry was made to this effect upon the docket at *nisi prius,*—neither party by such entries admitting to the other any right not then possessed by such party, nor to be thereby deprived of any right.

The case was thereupon argued and heard before the full court at the July term, 1888, at Portland.

In behalf of the defense, *Mr. Barker* contended that the newly-discovered evidence and accompanying motion was cognizable by the law court alone under R. S., c. 134, § 27, which is as follows: "If a motion for a new trial in a capital case is denied by the justice before whom the same is heard, the respondent may appeal from said decision to the next law term for such district; and the concurrence of but three justices shall be necessary to grant such motion."

This statute, by c. 152 and c. 173, public laws of 1889, approved January 25, and February 8, 1889, has been amended so that a person convicted of murder, "or of any offense for which the punishment may be imprisonment for life," may appeal from the decision of the justice by whom the motion for a new trial is denied; and the amendment was made to "apply to all pending cases in which an appeal has been or may be taken."

In behalf of the state, *Mr. Baker*, attorney general, contended that the statute was expressly confined to a capital case; and that at the time of the murder, in 1878, and at the time of the defendants' arrest and conviction, the death penalty did not exist.

Counsel for the defense also argued in support of both motions, and were followed by *Mr. Baker*, who replied with a brief, covering the various issues of fact.

The law court declined to take jurisdiction of the motions based on newly-discovered evidence, and they were remitted to *nisi prius,* where they came up for consideration by the chief justice, at the February term, 1889, in Penobscot.

At that term, for the reasons given in an elaborate opinion by the chief justice, and recently published, the motions were over-

ruled by him, and the defendants appealed to the full court. The appealed was transferred, by consent and agreement, from the law term for the eastern to the western district, where the case was re-argued at the July term, 1889.

*C. E. Littlefield,* attorney general, appeared for the state, who argued in support of the verdict, with a brief, containing a full analysis of the evidence.

*L. A. Barker and P. H. Gillin,* for defendants.

*Mr. Gillin* submitted an oral argument upon the general motion for a new trial. *Mr. Barker* argued the other motion, and contended that not until the news was received from Massachusetts, too late to be of use at the trial, that Charles Hamant had a horse stolen the day of Barron's death, was it, that there was any event that could be brought to the minds of witnesses by which they could remember the defendants with the 22d day of February, 1878, as being in Medfield. When the date of the Barron tragedy and the Hamant horse robbery were found to be the same, then it became capable of demonstration by credible witnesses that these men could not have been in Dexter that day. Counsel contended further that Barron's death was an unintentional suicide, and therefore accidental.

A brief upon the questions of law, arising on the motion for a new trial on account of newly-discovered evidence, was also submitted by *Mr. Barker* for the defendants. Counsel argued, that a new trial will be granted if the testimony, though cumulative, will make a doubtful case clear. *Barker* v. *French,* 18 Vt. 460; *Guyot* v. *Butts,* 4 Wend. 579; *Gardner* v. *Gardner,* 2 Gray, 443; *Watts* v. *Howard,* 7 Met. 480; *Chatfield* v. *Lathrop,* 6 Pick. 417; *Gardner* v. *Mitchell,* Id. 113; *Schlenker* v. *Risley,* 38 Am. Dec. 100; *Myers* v. *Brownell,* 16 Am. Dec. 731; *Parker* v. *Hardy,* 24 Pick. 246. New trial, in case of perjury. *Great Falls Mfg. Co.* v. *Mathes,* 5 N. H. 574. Other grounds. *Morrell* v. *Kimball,* 1 Maine, 324; *Strout* v. *Stewart,* 63 Id. 227; *Putnam* v. *Woodbury,* 68 Id. 58; *Ludlow* v. *Parks,* 4 Ohio, 44; 1 Bish. Cr. L. § 1273; *People* v. *Sanford,* 64 Cal. 27; *Hayward* v. *People,* 96 Ill. 492;

*Atkins* v. *State*, 11 Tex. App. 8; *Lindley* v. *State*, 5 Tex. L. J. 249; *People* v. *Keenan*, 104 Ill. 305; *Dennis* v. *State*, (Ind.) Cr. L. M. & R., vol. 7, p. 172, (1886); Gra. & Wat. New Trials, 1043, 1044, note 3.

FOSTER, J.　On the evening of February 22d, 1878, John W. Barron, cashier of the Dexter savings bank, was found within the vault of the bank, wounded, gagged, handcuffed, unconscious and in a dying condition. A few hours later death resulted. Ten years from that time the respondents were indicted, tried and convicted of the murder of this man. Thereupon a general motion to set aside the verdict was filed, and also a motion for a new trial on the ground of newly-discovered evidence. These motions were addressed to and heard by the chief justice of this court who presided at the trial. The motions having been denied, an appeal was taken to this court; and the question before us relates to the correctness of his decision in denying these motions for a new trial. Our determination must be based upon the record which has been presented before us, and which is very voluminous, comprising about twelve hundred printed pages of testimony from more than one hundred and fifty witnesses. Upon the combined evidence thus presented does the guilt or innocence of the respondents depend. With the utmost care and diligent research, in the investigation of this case, have we examined this vast volume of testimony; and the conclusion to which this court, by unanimous opinion, has ultimately arrived is, that the decision of the court below, denying these motions, was correct.

While it is practically impossible within the limits of this opinion to give any analysis, or even an extended summary, of the evidence introduced before the jury and upon the motions, it may be proper, in this connection, to say that, in a very lengthy and elaborate opinion by the learned justice who presided at the trial, and before whom the motions were afterwards heard, a very thorough, complete and exhaustive analysis of the evidence has been furnished as the basis upon which his denial of the motions was founded; and that opinion will undoubtedly be filed in the proceedings.

An examination of the record discloses two classes of evidence relied on by the government as fastening the guilt upon these respondents. These classes consist of the alleged confessions of both respondents in relation to the crime,—and their identification and presence within the state and in the immediate vicinity of these operations on two previous occasions the year before, and also their identification and presence in Dexter, and in and about the bank building, on the day on which the murder was committed. These two classes of evidence, while not in any sense dependent upon each other, are nevertheless in a most remarkable and striking degree in all their essential particulars entirely consistent, and in harmony with each other.

The story as told by Charles F. Stain of his father's confessions to him, and as to what occurred on two former trips of exploration from Massachusetts into Maine in 1877, was the starting point from which the government was able to develop, by testimony entirely independent of this witness, a chain of evidence of such strength as left no doubt in the minds of the jury of the commission of the crime charged and of the guilt of these respondents. That evidence when discovered stands upon its own merit, inasmuch as it is entirely disconnected with the testimony of young Stain, which was but the key which unlocked the chambers of this crime and made plain all the evidence of these men's guilt. However much of truth or fiction the disclosures of this man may be supposed to contain, there is certainly one fact which stands out transcendently above all others, and that is that these disclosures have led to the discovery of most important evidence against the accused, which would never have been discovered without his aid. While a large part of the testimony discloses evidence whose only object and purpose is to impeach this witness, it is a most striking and significant phase of the government's case, that it is in no sense dependent upon the credibility of this witness. The government's case does not rest upon the testimony of Charles F. Stain alone. It is not whether the story of this man, standing alone, is to be fully believed or not. The conviction of these men was not based upon that. Yet one of the most forcible demonstrations of the

substantial truth of the testimony of young Stain, in all the material elements of the case, is, that it is so completely in harmony with so many independent facts and circumstances, and the testimony of so many independent and distinct witnesses. Affirmations and denials by word of mouth may be fabricated; but circumstances and the happening of facts cannot. The latter is the crucible wherein to test the truth or falsity of the former. The corroborations of this witness in his accusation against the prisoners are not few or accidental, but many and various, each imparting and receiving strength from the other. It is not within the proper scope of this opinion to set forth in detail these numerous corroborations, which are disclosed by the vast volume of other testimony, introduced both to support and impeach the accusation made by this witness. It is sufficient to say that the record discloses these corroborations. They exist in reference to many matters, the evidence of which could not possibly have been anticipated by him, if his story were a fabrication. His story was told,—and in all its essentials the same as repeated from the witness stand,—long before he knew, so far as can be perceived, that a single witness or a single circumstance would be brought in confirmation of his accusation. As remarked by the chief justice in the opinion to which we have referred, "The story is full of details connected with each other, and of collateral facts, many of them of minor consequence, consistent with each other, which naked falsehood would hardly attempt to include in its manufacture. Truth weaves without effort a finer web than falsehood can with all its art and cunning."

With the story of young Stain as the starting point, the government next sought corroborative information from John F. Harvey, who for years was an associate of the respondents, but who for a long time had lived apart from them. He is a brother-in-law of the defendant Stain, and testified to statements and confessions made to him by Cromwell five years before the trial, and before the story of Charles F. Stain. This information was not volunteered on his part, nor did he confess any knowledge of the affair until a second interview made on behalf of the government

in June or July, 1887. This witness is also supported in the details and circumstances of this confidential admission confided by Cromwell to him, in the fall of 1882, and by the subsequent statements of Cromwell to another government witness tending strongly towards confession, and which Cromwell upon the stand found it very difficult to deny. Very many of the details given in the story of young Stain in relation to circumstances and transactions prior to this tragedy, are also given by Harvey, with little chance of confederation between them.

But how is this testimony and the case of the government met on the part of the defense? It is not one of confession and avoidance,—not one which admits that there had been excursions from Medfield into Maine prior to 1878, in which young Stain had accompanied these respondents for proper and legitimate purposes, but that the father never confessed that he was in Dexter in February, 1878,—or that Cromwell, although admitting other crimes to Harvey, his former associate, had never acknowledged his guilt in this affair. No. The defense strikes deeper and bolder than that. It is this : That Barron died by his own hand, and that the prisoners had no connection whatever with his death ; that they never made any preliminary excursions into Maine prior to his death ; and that they were never in Dexter in their lives, and that the testimony of young Stain and Harvey is wholly false and devoid of any foundation.

That these respondents had not only made two former excursions of exploration into Maine, and into Dexter,—once in the summer and once in the fall before this tragedy,—and had been transported across the country from this point to Corinna and Madison, there can be no shadow of doubt, as the evidence from numerous witnesses upon that point, detailing facts and circumstances, is both convincing and conclusive. Upon this question the testimony of Charles F. Stain is incontrovertibly corroborated. While his testimony is attacked upon minor matters of details, and to some extent in relation to dates given by him, it is nevertheless supported and fortified by an array of facts and circumstances too strong to be overcome. The essential question was not over dates but over events. It was not so much what month

these trips were made, as whether or not they were made; and whether these respondents were in Dexter and were carried across the country to other points on two occasions prior to this tragedy. This was a strong point in behalf of the government. It was so conclusively proved, independently of the testimony of young Stain, that its effect was materially felt by the defense, which asserted as boldly that the prisoners were never in Dexter in their lives, as that they had no connection with the death of Barron.

But the most important evidence, perhaps, in the case is that which was offered to prove that the prisoners were seen in Dexter during the day of Barron's death. Upon this, as well as in explanation and corroboration of the other evidence, depended the great power of the government's case. The important and convincing facts which overthrow all defense in connection with the fact, that these respondents had made other and previous visits into Maine, and which went to prove the guilt of these two men, were, that witness after witness of intelligence and respectability saw and identified them under a great variety of circumstances; sometimes singly, sometimes together; and picked them out as being two of the men, and strangers, whom they saw in the town of Dexter on that fatal day. This evidence in relation to identification is both direct and circumstantial. It comes from a large number of witnesses. Some saw them while going to Dexter, others saw them in Dexter, and others identify them in their flight on the evening of the day of the tragedy, and still others in the early morning and in the forenoon of the next day, still in their flight from town. Some witnesses positively identify these men, while others do this indirectly and corroborate numerous witnesses by the description of their manner and bearing, by the color of their dress, and the appearance of the horse driven by them. All the witnesses give reasons for their remembering as they do, and state circumstances. The proof of identity is not confined to the single fact of the recognition of the faces of the prisoners. There are many circumstances and coincidences combining with that, which have great weight on the question of identification, and which are detailed in connection

with the general statement of the witnesses. It may seem strange at first thought that the witnesses are enabled to remember and identify these men after so long a time. Under ordinary circumstances this would be true. But it must be borne in mind, that in consequence of the sudden and dreadful shock produced by the death of Barron, every person in the community immediately sought to reproduce in his own mind the presence and appearance of any strangers seen on that eventful day, and the impressions then received, by those who saw strange persons in town and in that vicinity, have been vividly retained in their minds ever since. The startling event, shrouded in mystery during all these years, has served to stamp indelibly upon their minds and memories the impressions received at the time; and their testimony is but the reproduction of what they saw and noted, and even discussed, when every circumstance was fresh in their recollection,—when every incident was carefully treasured up in the storehouse of their memories. It was an old picture brought out into clear light after having been laid away for years. The presence of strangers in a village of the size of Dexter, and in sparsely settled towns, is much more readily noticed than in cities or larger places.

It is a significant fact that the identification of these men is not dependent upon the testimony of one witness, but upon many and different witnesses, who differ among themselves only in slight and not in essential respects. It is not whether one witness may be mistaken, nor several, but whether twenty or more witnesses, testifying independently of each other, who saw the prisoners at different places, at different hours, and whose testimony is fully supported and fortified by other facts and circumstances, can be mistaken. Nor is it whether they may be mistaken as to one man, but as to two men seen under the same circumstances; they would be much more likely to be mistaken as to one man than they would as to two men, with the very marked characteristics pertaining to these two men. They differed in height, in dress, in the manner of their bearing, one being short, stout and erect, the other one taller and stooping or round-shouldered. It would be remarkable, to say the least, if the persons

are not the strangers who were seen and identified by so many different witnesses ; and if so many different witnesses have been mistaken about their identity, when the facts and circumstances corroborating them are so varied and numerous. The witnesses appear to be people of business standing and respectability. But the defense is, that this is all a mistake and error on their part; that they have mistaken the prisoners for some other persons. No one, however, with such a body of evidence, can say that there were not two or three persons, strangers to all, in the town of Dexter on the day of the murder. One class of witnesses identify David L. Stain as one of those strangers ; another class identify Oliver Cromwell as another of those strangers; and still another and the more numerous class identify both Stain and Cromwell as two of the strangers. If there is any force in human testimony it must be admitted that two of those strangers, whoever they were, happened to look not only like one man but they happened to look like two different men. If it be true that two casual strangers, who happened to be in Dexter on that particular day, bore this striking and remarkable resemblance, one to Stain and the other to Cromwell, and it was a case of mistaken identity, would not, long before this time, at least one of the originals have been found ? Would not at least one of the men, or both, who bore this curious and remarkable resemblance, so as to deceive everybody who saw him, have been discovered ? It is reasonable to believe that the energy and exhaustless fertility and thoroughness of research, which has characterized this defense, would have been directed towards this vital branch of it, if there had been a possibility of success. The defense has had the free use of the county treasury for the payment of every witness called at the trial and since the trial, the expenses of commissioners, of printing, and miscellaneous bills up to the time the case was laid before this court. But no witnesses have ever appeared to account for these strangers, except those introduced by the government who identify them with the prisoners.

From the great mass of testimony upon this question of identification, the conclusion to be drawn is irresistible that two of the strangers were these prisoners, and that they were seen in the

village of Dexter, and around the savings bank, upon the day of Barron's death. No more appropriate language can express the conclusion to be drawn from the testimony upon this question of identification than that of the justice who saw the witnesses and heard their testimony: "It is about as morally certain as human evidence can establish a thing, that on the 22d of February, 1878, there were in Dexter three strangers, two of them having been more prominently noticed than the third one. These persons were about the streets seen by many men, and known to no one unless to Maddox. They were well dressed, and not common looking persons, possessed of a valuable team, and carrying luggage. There can be no doubt that they were not in Dexter for any honest purposes, or upon any honest business, for it would have been known to somebody in Dexter, or the fact would have been afterwards easily ascertained. They visited no house, stopped at no hotel, entered no store, but for crackers and cheese, and were in no shop excepting Dustin's, where there were mechanical tools, only one of them appearing at such places at a time. They are not known to have spoken to a human being in Dexter during the day, excepting in the store and shop named, and to Maddox, at whose inconspicuous and retired place they stabled their team. They were prospecting around the bank building a good deal of the day. They were seen in the building with no business in either bank. They decamped as suddenly as they came. Two of them travel all night with hardly a stopping moment for their horse, seeking when the day came roads exposed to but little observation, until they go out of sight. There can be no doubt that the persons who drove the team into Dexter drove it out. The horse which Maddox describes is described by those who saw the fleeing team. The same men he saw were seen all along the route. It is impossible that the strangers in Dexter should not have been discovered before this, if they were persons other than the prisoners, and were innocent persons. The trial of this case has advertised in all the papers of the land for their discovery, and no response comes. No other persons than the prisoners have been suspected of being the strangers in Dexter. No person turns up to explain the presence of the

strangers at Mrs. Miller's at Bangor, or at Dexter, or on the road, out side of the prisoners."

Nor is this chain of evidence weakened by the theory of suicide set up in defense. To dispose of that theory requires but a passing word. A candid and careful examination of the evidence can not fail to convince the mind, seeking after truth and unbiased by prejudice, that such a theory is groundless,—if not fanatical. It ignores consistent and convincing facts and all reasonable presumption, and grasps at trivial circumstances and groundless suspicion. The brief summary of facts to which we have already alluded,—facts which left no reasonable doubt in the minds of the jury who heard them,—militates absolutely against any such theory as suicide. There is no reasonable or consistent hypothesis developed from the evidence in the case upon which it can be based. Barron was not a defaulter of the moneys of the bank at the time of his death. The evidence nowhere indicates it. Nor was this attempted to be shown at the trial. Years before, the books of the bank had been subjected to a most thorough and critical examination, by auditors of business experience and ability appointed by this court, and while there was found a technical deficiency, it was of a sum so small that it could have been easily supplied by Barron at any time. No man had better credit in the community, and he had sufficient means of his own with which to make good any sum that might be shown to be due from him. He was treasurer of the town as well as cashier of the bank, and was custodian of moneys for other people. No suggestion is to be found that he was ever guilty of default or fraud towards any of them for the slightest amount. If his death resulted from suicide, what a remarkable coincidence of events surrounded it. Why should it happen at the exact moment when strangers, not only to him and his designs, but to every person in that community, were in town for the very purpose of robbing the bank? Why should it happen that if, as claimed by the defense, he committed suicide to give the appearance of robbery, strangers were upon the very premises at the same time for the purpose of. committing a real robbery,—or murder,—or both? But to go a step further. What a wonderful

concurrence of events, that, on the very day and hour that Barron killed himself to give the impression to the world that he had been robbed, there were three strangers on the spot,—seen by many but unknown to all,—upon whom suspicion fell at once as soon as Barron was found, and yet of whose business and whereabouts, from that time to the present, not an iota of information has been discovered. Strangers disclosing no business to any one, though in town, upon the streets, and in and around the bank building, the greater part of the day, speaking to but two persons, stopping at no house, and disappearing as mysteriously as they came on the very hour Barron was lying unconscious and dying within the vault of the bank. If these strangers were innocent of Barron's death, it adds to the mystery that they should flee at the very moment when they would have fled if guilty either of robbery or of murder. And what can we say of the additional coincidence of facts and events, if this be suicide, when we consider the proof of identification of these strangers with that of these two respondents, and to which we have before alluded? It is.inexplicable to say the least.

This theory of suicide presents no sufficient motive for such an act. While it is an axiom, as true as it is old, that all the actions of sane men depend upon motive as the power which prompts or propels them to the performance of those acts, in this case the evidence, mostly introduced by the defense, indicates any thing but motive, and furthermore, disproves any intention of suicide in Barron's mind on that fatal day. It needs no summary of the facts to establish this. We have already spoken of the fact that no financial embarrassment was pressing upon him. The alleged irregularities upon the books of the bank, and which to some extent is relied on as the excuse for the origination of the theory of suicide, in no way affected the bank or any of the depositors. The four depositors in whose accounts the apparent irregularities exist, testify that in no instance have they lost anything by these seeming irregularities. That there were some changes and peculiarities in the manner of keeping the accounts of the bank is obvious; but that either the bank or any depositor was in any way injured thereby is not established by the evidence.

Nor is there any motive even for the alleged act of apparent unintentional suicide, or having thrown himself into a stupefied condition by the use of some narcotic, as if by some act of burglars, and that in so doing death resulted unintentionally. This theory is as groundless as the former. It not only lacks motive but evidence to support it. The inference legitimately deducible from such a theory can be no other than that there was no motive sufficient to induce intended death. The two theories are totally inconsistent with each other. In defending Cœlius against the charge of attempting to poison Clodia, Cicero asks,—"Is it likely so great a crime would be committed without any motive whatever?"

For more than a year after this tragedy, the theory of suicide, either intentional or unintentional, was not suggested by any person. With the same evidence substantially as now exists, the officials of the bank as well as the public believed it murder. The evidence which is now claimed to support suicide, was accepted as the evidence of murder. A coroner's jury, at the head of which sat one of the bank officials who has, as the evidence shows, been active and zealous in advancing the suicide theory, declared that Barron had been murdered. The trustees issued circulars soliciting subscriptions and donations from banks and individuals, for the purpose of defraying the expenses of "ferreting out the criminals," of erecting a suitable monument to the memory of Barron, and as a gift to his widow. Six thousand dollars were thus raised and given to the widow of the murdered man. The president and trustees also by public advertisement announced a reward of $1,000 for the "detection of the murderers, or any one of them."

On the day of Barron's death he was busy in making writings for his neighbors, paying depositors, settling accounts with the town collector, working at his desk up to five o'clock that afternoon. There was nothing unusual in his appearance upon this day. To believe that he committed suicide, in the way and manner set up in defense, would require a belief that he had deliberately contemplated it and planned its execution, even to the details, for it is not contended but that it would require time and

method if done by his own hand. But if the defense is correct it would require quick work on his part. His bank associates were with him till past five o'clock, and when last seen there he was busy with his ordinary duties. If he died by his own hand he must have accomplished the deed with all its incidents within an hour from that time. It could have been done in much less time by three assailants. But his work would not only require time but deliberation. If resolved on death, why such torture prolonged for hours before death relieved him of his sufferings? If resolved on death, what need of artifice on his part to conceal the cause of his taking his life? There are many reasons why suicide is inconsistent with the facts and circumstances surrounding the transaction. There is nothing in the facts and circumstances inconsistent with murder. More than that, they are consistent with and indicative of murder, and the government presents a strong case upon that point. The evidence is overpowering, and crushes the theory of suicide.

Another branch of the defense relied upon, in answer to the evidence on the part of the government, is the alleged *alibi.* For it is admitted by the defense, that if the prisoners were in Dexter on the day of Barron's death, the inference of their guilt cannot be resisted; but it is contended that they were at their homes in Massachusetts on that day. And no pains have been spared in attempting to establish the presence of both Stain and Cromwell in Medfield on the 22d day of February, 1878. Both were witnesses, and each endeavors to account for himself on that day. Unfortunately for Cromwell he is not able to fix upon any individual besides his wife whom he saw that day. It is upon this branch of the defense, that the great bulk of the alleged newly-discovered evidence has been introduced, since the trial, and in support of the motion. Here we meet a very different class of witnesses, and the great majority of them, if we are to judge anything by their testimony, are deeply interested in the result of the case; and many of them friends and associates of the prisoners, without much character or position, who seem to be willing to do anything within their power in their behalf. This testimony we have examined with great care, and while it might be

somewhat interesting to analyze it, for the purpose of showing its numerous discrepancies and inconsistencies, it would not be advantageous or practicable so to do within the limits of this opinion. As regards this testimony introduced by the defense to show the prisoners in Medfield on that day, it need only be said that, when carefully analyzed, it is so contradictory in itself, and so entirely overborne by the testimony on the part of the government, that it can have no moral or legal weight in sustaining the motion for a new trial. It is contradictory as between the witnesses upon the same side,—it is contradictory to Stain himself who lacks neither in power of memory nor ability of narration, and who it may properly be assumed, ought to know more of his whereabouts on that day than any one else. The testimony in defense, upon this question of *alibi*, shows affirmatively an absence of the prisoners from Medfield upon the day of this tragedy. The government conclusively establishes their presence in Maine. The fact that Hamant's horse was stolen in Medfield on the night of February 21, 1878, has been put forward as a circumstance to enable persons to remember seeing Stain upon the day following. But that circumstance, as shown by the government not only upon cross-examination but by independent witnesses, was a potent factor in establishing the fact most conclusively that the prisoners were absent from that town at the time, and that they were not suspected of the theft because of their absence. There is not a witness who swears that Stain or Cromwell was seen upon the street in Medfield on the 22d day of February, 1878, when the excitement was rife and search was being made for the discovery of the stolen horse. Not a witness for the defense was engaged in the search. Nor did they hear of any suspicion being cast upon Stain of stealing the horse. But five witnesses, among whom was the secretary and one of the directors in the Medfield Thief Detective Association and active in the investigation, testify positively that Stain was not in the search nor seen by them during the day, although Stain himself claims, to have taken part in the search, and mentions seeing one of these witnesses. They further testify that upon inquiry Stain was found to be away from home. While the motion alleges that the de-

fense will show that Stain was suspected of being guilty of stealing the horse, and that public attention was turned to him on the 22d, on that account, the evidence introduced shows no such facts, but, on the contrary, the opposite is shown,—that suspicion did not attach to him, and for the reasons before stated.

The only witnesses introduced under the motion and who claim to have seen Stain at his house on the day in question, are contradicted by Stain himself, by other witnesses, and by circumstances. The defense, in its attempt to prove that Stain was in Medfield, has failed to succeed, while the government in the new evidence, has succeeded in proving the exact contrary. It is unnecessary to attempt to summarize the evidence upon this point. Upon these questions of fact the court can only state conclusions to which it has arrived, and which are fully supported by the evidence. To attempt more than that would require the introduction of so much of the record, that any opinion would be little more than a full and detailed statement of the evidence.

We have now considered the different phases of the case as presented by the government, and the several positions assumed by the defense.

The question whether a new trial shall be granted, having been once passed upon by the tribunal, whose duty it was to hear and decide the matter in the first instance, it now becomes the duty of this court in its final determination carefully to weigh and consider the question thus presented. This we have done. We have carefully taken into view, not only the great mass of testimony, but all the circumstances of the case, with as favorable a consideration for the prisoners, as may be consistent with a due regard to the rights of the public, and sound principles of justice. From no standpoint on which we have been able to view the evidence before us, whether it be that given at the trial, or in connection with that subsequently produced in support of the motion, are we satisfied that a new trial should be granted.

In regard to the supervisory power of the court over verdicts, and in relation to the granting of new trials the uniform and unquestioned practice in this country has been, with a very few

exceptions to be found in the earlier cases, to extend to criminal cases the same principles which are applicable to civil actions. In the application of that rule to the present case, upon the evidence submitted to the jury, no sufficient grounds are shown whereby the verdict should not be permitted to stand.

But the principal reliance of the defense is based upon what is claimed to be the newly-discovered evidence in the case. Notwithstanding the discretion of the court in such cases is very broad, and will be exercised by the court in granting a new trial, whenever a proper case is presented, yet there are well-settled rules by which the court in this as in all other cases should be governed. In order to warrant a new trial upon the ground of newly-discovered evidence, it should be made to appear that injustice is likely to be done by refusing it, and therefore it becomes necessary for the court to take into consideration the weight and importance of the new evidence, its bearing in connection with the evidence on the former trial, and even the credibility of witnesses. And this rule is applicable not only to civil but criminal cases. *Ordway* v. *Haynes*, 47 N. H. 10; *State* v. *Carr*, 21 N. H. 166, 169, 173; *Parker* v. *Hardy*, 24 Pick. 246; 2 Whart. Crim. Law, § 3061. An eminent English judge, noted for his learning and wisdom has said: "Such applications should be cautiously admitted, as it would be a great inlet of perjury." *Vernon* v. *Hankey*, 2 T. R. 120.

And it is a well-established rule that a motion for a new trial should not be granted on the ground of newly-discovered evidence, unless the evidence is such as ought to produce, on another trial, an opposite result upon the merits. Thus in Pennsylvania, in the case of *Com.* v. *Flanagan*, 7 Watts & Serg. 423, upon a motion for a new trial after conviction in a capital case, the supreme court of that state gives expression upon this question in the following language: "After verdict," say the court, "when the motion for a new trial is considered, the court must judge not only of the competency, but of the effect of the evidence. If, with the newly-discovered evidence before them, the jury ought not to come to the same conclusion, then a new trial may be granted; otherwise they are bound to refuse the applica-

tion.  And in *Lewellen* v. *Parker,* it is ruled that, in considering the motion, the court will not inquire whether taking the newly-discovered testimony in connection with that exhibited on the trial, a jury might be induced to give a different verdict, but whether the legitimate effect of such evidence would require a different verdict.  The question, therefore, is (supposing all the testimony, new and old, before another jury) not whether they might, but whether they ought to give another verdict."  This doctrine is affirmed in numerous decisions by the highest courts in this country.  *Handly* v. *Call,* 30 Maine, 10; *Snowman* v. *Wardwell,* 32 Maine, 275; *Todd* v. *Chipman,* 62 Maine, 189; *Trask* v. *Unity,* 74 Maine, 208; *Halsey* v. *Watson,* 1 Caines (N. Y.) 24; *Thompson* v. *Com.,* 8 Gratt, (Va.) 637; *Carr* v. *State,* 14 Ga. 358; *Ludlow* v. *Park,* 4 Hammond (O.) 5; *Ewing* v. *McConnell,* 1 A. K. Marsh (Ky.) 188; *Sheppard* v. *Sheppard,* 5 Halst. (N. J.) 250; *Morris* v. *Hadley,* 9 Mich. 278; *State* v. *Burge,* 7 Iowa, 255; *Middletown* v. *Adams,* 13 Vt. 285; *Harris* v. *Thompson,* 23 Kan. 372; *Brown* v. *Lurhs,* 95 Ill. 195.

The learned judge who heard these motions presided at the trial.  He heard the testimony given on that trial from the mouths of the witnesses, was enabled to observe their conduct and demeanor, and to some extent had better means of weighing the credibility of their conflicting statements, than the full court can have from an examination of their printed testimony.  He also saw many of the witnesses introduced since the trial and heard their statements and observed their appearance and deportment.  After a full and deliberate consideration of all the evidence in the case, and with a most thorough and exhaustive analysis of the same, he denied the motions.  It is a rule that prevails not only on the equity side of the court, but also in actions at law, that the decision of a single justice upon matters of fact decided by him is entitled to proper weight, when the case is heard by the whole court, upon a full report of the evidence adduced at the original hearing.  The courts of last resort, both in this country and England, in the application of this rule, hold that such decision should not be reversed unless it clearly appears that such decision is erroneous, and that the burden to

show error falls upon the appellant. *Young* v. *Witham,* 75 Maine, 536; *Reed* v. *Reed,* 114 Mass. 372; *U. S.* v. *112 Casks of Sugar,* 8 Pet. 278, 279; *The Glannibanta,* 1 L. R. P. Div. 283. But in the case before us there is no necessity for the application of that rule. For laying aside all weight to which the decision of the sitting justice is properly entitled, it is the opinion of this court that upon a careful, thorough and impartial consideration of the evidence before it, no new trial should be granted. It does not appear that any injustice will be done in refusing it. The legitimate effect of the entire body of new evidence, to which we have had occasion to allude in another part of this opinion, taken in connection with the other evidence, is by no means such as ought in the opinion of this court, to produce an opposite result on another trial. Nor would the jury be warranted, from anything that appears in the case, in arriving at a different conclusion from that already found on account of it. Without this, it is the duty of the court to deny the motion and allow the verdict of the jury to remain undisturbed.

*Motions overruled. Judgment for the state.*

PETERS, C. J., WALTON, DANFORTH, VIRGIN, LIBBEY, EMERY, and HASKELL, JJ., concurred.