## STATE OF MAINE
### *vs.*
## VINCENT E. DUGUAY

Androscoggin.   Opinion, February 28, 1962

62

*Frank E. Hancock, Atty. Gen.,*
*Gaston M. Dumais,* for State.

*Thomas E. Day, Jr.,*
*John E. Kivus,* for defendant.

SITTING: WILLIAMSON, C. J., WEBBER, TAPLEY, SULLIVAN, DUBORD, SIDDALL, JJ.

WILLIAMSON, C. J.   The respondent Vincent E. Duguay was found guilty of the murder of Annette Cross at the March 1960 Term of the Androscoggin Superior Court. The case comes before us on appeal and three exceptions.

## EXCEPTION I

Three colored photographs, or slides, of parts of the head and brain of the deceased taken during the autopsy were admitted over objection of the respondent.   They were shown to the court and jury enlarged by projection on a screen, and in like manner to the Law Court at argument.

The deceased was killed by a bullet in the brain from a rifle discharged by the respondent.   The pathologist, who

conducted the autopsy and took the photographs, testified in careful detail about the course of the bullet and the cause of death. The photographs without question fairly represent the facts.

The governing principle has been stated succinctly by the Oklahoma Court in these words:

"... such photographs are admissible when they are relevant to the issues before the court and their probative value is not outweighed by the danger of prejudice to the defendant." *Glenn v. State*, 333 P. 2d 597, 601; cert. den. 359 U.S. 1014, 79 S. Ct. 1155.

Admissibility of photographs under these principles rests upon the exercise of sound judicial discretion. In other words, there is no error in the absence of abuse of discretion.

Our court has expressed the rule in these words:

"Photographs of a dead body, although gruesome, if accurate are admissible in the discretion of the trial court, and unless there is an abuse of judicial discretion no exception lies thereto. . . These photographs met the test. There is not the slightest evidence in the case even tending to indicate that there was abuse of discretion on the part of the presiding justice in the admission of these photographs." *State of Maine* v. *Rainey*, 149 Me. 92, 94, 99 A. (2nd) 78.

"Counsel for the respondent argues that there was an abuse of discretion by the trial justice in admitting in evidence a photograph of the dead body of the deceased; that such photograph was too gruesome and could not but have prejudiced the jury against the respondent. Although exceptions to its admission were noted, they were not perfected. Were they now before us they could not be sustained. The photograph was properly taken; it had relevancy in determining the atro-

ciousness of the crime; it was no more gruesome than the testimony related by the respondent on the stand; in any event its admissibility was within the discretion of the trial justice. *State v. Turner*, 126 Me. 376; *State v. Stuart*, 132 Me. 107, 108." *State of Maine* v. *Turmel*, 148 Me. 1, 7, 88 A. (2nd) 367.

See also *Commonwealth* v. *Makarewicz*, 333 Mass. 575, 132 N. E. (2nd) 294; 23 C. J. S., *Criminal Law* § 852; Annot. 159 A. L. R. 1413, 1420; 2 Wharton's Criminal Evidence (12th ed.) § 687.

Other cases cited by the respondent do no more than apply the general rule to differing factual situations. *People v. Redston* (D. C. Cal.) 293 P. (2nd) 880; *State v. Bischert* (Mont.) 308 P. (2nd) 969; *People v. Jackson*, 9 Ill. (2nd) 484, 138 N. E. (2nd) 528; *Craft v. Commonwealth* (Ky.) 229 S. W. (2nd) 465; *Oxendine* v. *State* (Okla.) 335 P. (2nd) 940.

Like principles apply to the use of colored and ordinary or non-colored photographs. As the respondent aptly points out, "It is clear that colored photographs provide superior information over non-colored ones if otherwise equally admissible." Color is a fact to be considered in determining the issue of admissibility. Color in itself, however, is not the test. The test lies in the effect of the photograph, whether colored or non-colored. *Commonwealth* v. *Makarewicz, supra.* See also *Knox* v. *Granite Falls* (Minn.) 72 N. W. (2nd) 67, 53 A. L. R. (2nd) 1091, and annot. 1102.

The photographs met the first test. Plainly they were relevant to the issues, and particularly to the issues discussed by the pathologist. *Rawley* v. *Palo Sales, et al.*, 144 Me. 375, 70 A. (2nd) 540; 20 Am. Jur., Evidence § 727.

The respondent urges that the photographs of parts of the corpse inflamed the jury, or were likely to create bias

and hate. Again we have a question for decision within the broad limits of judicial discretion.

The respondent seeks to distinguish the instant case from *State* v. *Ernst*, 150 Me. 449, 454, 114 A. (2nd) 369, in which we said:

> "The law is well settled that the mere fact that a photograph is gruesome is not a reason for its non admission. . .

> "The presiding justice has great latitude and discretion in determining the admissibility of photographs and unless there is shown an abuse of discretion, his ruling will not be disturbed on exceptions."

The respondent points out that in *Ernst* the parts of the body shown in the photographs had not been interfered with by incisions during autopsy, and also that evidence of various wounds and abrasions was shown. The argument goes not to the rule but to its application to the facts. The *Ernst* case did not fix a line between admissibility and rejection on its facts.

Men and women of standing to be jurors and who have passed into the jury box are not so weak and untutored that they would be influenced to return a verdict of guilty by reason of the photographs. Surely the average man and woman is not so far removed from pain and sorrow, from gruesomeness, from scenes of death and violence and the like, that photographs such as these would turn the reasoning mind into dislike of or prejudice against a respondent defending himself in the halls of justice.

The Oregon Court, in upholding the admissibility of a colored slide photograph in connection with medical testimony regarding the fatal wound in a homicide case against a charge of gruesomeness, said:

> "If a jury is incapable of performing its function without being improperly influenced by evidence having probative force, then the jury system is a failure." *State* v. *Long* (Ore.) 244 P. 2d 1033, 1053. Commented on in 53 A. L. R. 2d 1103.

We do not say that there may not be situations in which the danger of prejudice outweighs the probative value of photographs. We are convinced, however, that such is not so in the instant case. There was no abuse of judicial discretion in the admission of the photographs. Exception I is overruled.

### Exception II

This exception from denial of respondent's motion for mistrial reads in part:

> "When the Jury was leaving the Androscoggin County Building during the noon recess and on their way to lunch and in the course of the trial it came to the attention of the court and counsel for the State and counsel for the Respondent that a member of the Jury trying the case had separated from the other members of that body and had a conversation with another person or two persons. It was shown that the said juror had the conversation with the wife of the Jury Foreman."

A hearing was held by the presiding justice at which the Clerk of Courts and a jury officer, both of whom saw the incident but did not hear the conversation, and a member of the jury and the wife of the foreman, who engaged in the conversation, testified. At most, the conversation was no more than a request by the foreman's wife to the member of the jury "if (her husband) needed something to tell me." The incident took no more than a moment.

The respondent contends that the separation of the jury and conversation of a juror with the wife of a foreman compel a mistrial. In our view there was no separation of the

jury which the law should notice. The juror was at all times in the sight of a jury officer, and at most departed no more than a few feet from the line in which the jurors were walking in a hall in the courthouse. In *State* v. *Woods*, 154 Me. 102, 144 A. (2nd) 259, the court, in applying the general rule, said at p. 106:

> "In our view the decision here is controlled by our determination as to what constitutes an unauthorized 'separation' which the law will notice. It is not every withdrawal of one or more jurors from their fellows that constitutes a 'separation' in the legal sense. . . The rules governing the supervision of a jury during the often protracted trials of capital cases must be realistic and practical while at the same time eliminating insofar as possible any reasonable opportunity for communication, outside influence and prejudice. Both the State and the respondent are entitled to a verdict which is the product of minds which are influenced only by the law and the evidence properly submitted to them during the trial and the jurors themselves are entitled to be protected from even the appearance of improper influence in order to be assured of public confidence in their verdicts."

In the instant case there is the fact of conversation not present in *Woods, supra.* No one condones irregularity in the conduct of a juror, but what in all fairness has the respondent suffered? Could the wife's inquiry about her husband's needs in any way have influenced his judgment, or that of the juror to whom the inquiry was addressed, or that of the ten other jurors? The maintenance of purity in the conduct of a trial does not compel the discard of common sense. The presiding justice was entirely justified in finding that there was no opportunity to prejudice or influence the jury under the circumstances.

In reaching this conclusion we apply the principle that by a separation of the jury and a conversation with a third

party by a juror, prejudice will be presumed until rebutted by the State. This burden has plainly been met by the State in this instance. *Johnson* v. *State*, 7 Ga. App. 186, 43 S. E. (2nd) 119 (two jurors mingled in courtroom; state maintained burden of no prejudice) ; *Gay* v. *Commonwealth*, 303 Ky. 572, 198 S. W. (2nd) 308; *Adams* v. *Commonwealth*, 310 Ky. 506, 221 S. W. (2nd) 81 (state failed to show clearly no opportunity for improper influence). See annotation on separation of jury in criminal cases in 21 A. L. R. (2nd) 1088.

The respondent cites several cases of direct interference with a jury and of gifts or gratuities to the members. The differences between such situations and the simple inquiry by the juror's wife are apparent. *Bradbury* v. *Cony*, 62 Me. 223 (error for party's son to show premises to a juror) ; *Ellis* v. *Emerson*, 128 Me. 379, 147 A. 761 (error for counsel to invite jury to dinner after verdict). See also *Shepard* v. *Street Railway*, 101 Me. 591, 65 A. 20; *Rioux* v. *Portland Water District*, 132 Me. 307, 170 A. 63; *State* v. *Brown*, 129 Me. 169, 151 A. 9; *York* v. *Wyman*, 115 Me. 353, 98 A. 1024.

The principle is well illustrated in *State* v. *Shawley* (Mo.) 67 S. W. (2nd) 74, 90, in which the court said:

> "But the possibility of improper influence being exerted through a sealed letter to a juror seems to us stronger than would be true in the case of a bundle or package, since the latter would hardly be turned over to a sworn officer for delivery to a juror except in the expectation that it would be inspected. Furthermore, in the instant case the defendant's own showing is that the bundle came casually from the wife of the juror on Saturday afternoon in circumstances which called for and would have been susceptible of further evidential development if there had been anything sinister in them. We have been able to find only one case that seems to be in point. In Com. v. Thompson, 4 Phil. (Pa.) 215, 220, the defendant was convicted of first

degree murder. In his motion for new trial he complained of a separation of the jury during the trial. The proof showed that as the jury were passing through the vestibule of the Law Building one of the jurors lagged behind and had a brief conversation with his wife; he and she both testifying that her only purpose was to inquire how he was and to furnish him with a change of clothing, nothing being said about the pending trial. It was held the separation did not vitiate the verdict. Without in the least condoning the practice and granting the burden is on the state to disprove prejudice where the reasonable possibility thereof is shown, we are constrained to hold the improprieties complained of here, on their facts, were not such as to call for a new trial as a matter of law. The trial judge passed on these questions. Some measure of discretion must be confided to him, since he is in a much better situation to acquaint himself with the actual situation."

The respondent urges that prejudice will be conclusively presumed (1) from a conversation between a juror and an unauthorized person as in this case, and (2) if not conclusively presumed, then the State has not rebutted the presumption by clear and convincing proof.

We have indicated there is no conclusive presumption of prejudice arising from an incident such as the one under discussion. The continuance of a trial to verdict ought not to rest upon the chance that no one acts in a manner that might under some circumstances be considered prejudicial. A respondent is sufficiently protected if the State is compelled to rebut the adverse presumption by clear and convincing proof. The State met this burden, and the motion for new trial on this point was properly denied.

## EXCEPTION III

This exception also arises from denial of a motion for new trial. The exception reads in part:

"When the jury was deliberating following the charge of the court, it came to the attention of the Respondent's counsel and then of the court that two jury officers at one time, and three jury officers at another time had been in the Jury Room with the door closed. . .."

Hearing was held by the presiding justice at which the following witnesses appeared: Three jury officers, Mr. Bergeron, Mr. Philippon, and Mrs. Denis, and the foreman of the jury.

The court received a note from the foreman asking for sandwiches and coffee, and instructed Mr. Bergeron to ascertain the preferences of the jurors. Mr. Bergeron knocked at the door of the jury room and "the foreman opened the door and I said, 'Now what would you like to have?' So he said, 'Come in' and closed the door. Some started to say 'ham' and so forth. I said to the foreman, 'Take the number of what they want, if it is lobster or ham.' So there were two ham sandwiches, one without mustard; the others were lobster. So I said, 'Put it on the paper' and I took it out and gave it to Sheriff Bob."

Mr. Philippon testified he entered the room with Mr. Bergeron to take the orders and returned to deliver the food with Mr. Bergeron and Mrs. Denis. Mrs. Denis was in the room only to deliver the sandwiches and heard no conversation. The jury foreman did not recall the officers entering the room to take the orders. He testified:

"Q  The time you recall their coming into the room was when they delivered it?

"A  Yes, I believe so.

"Q  Was there any talk at all by the jurors when the officers were in the room with the door closed?

"A  There may have been a slight exchange of a few words like 'Put it here' or 'Move this,'

something of that nature, to my knowledge, pertaining to the food and the items brought in.

"Q Other than that, you do not know of anything else?

"A No, sir, I don't."

The respondent argues forcefully that the mere presence of a bailiff or court official with a jury during deliberation on a murder case behind closed doors creates a conclusive presumption of prejudice, and thus compels a new trial. In this view, prejudice or lack of prejudice is not to be determined as a fact, and the presence of the jury officer in the jury room is not subject to explanation.

The necessity of protecting the inviolability of a jury's deliberations and decision is not questioned. *Ellis* v. *Emerson, supra; Shepard* v. *Street Railway, supra.* The point is what safeguards are required to preserve this essential purity. We conclude the rule urged by the respondent goes beyond the need. Can there be the slightest doubt that in this instance no prejudice to the defendant could have resulted from the simple acts performed by the three jury officers? As the presiding justice well said:

"The jury wanted something to eat in this particular case, and the Court had one of two methods by which it could have been provided. One was the method used, and the other would have been to send the jury to the hotel with the jury officers. Had the jury been sent to the hotel for dinner they would have been in a separate room by themselves with the jury officers and with the waitresses, and certainly there was less contact with the jury officers or with anyone else by the method that the Court used than there would have been by sending the jury out to eat. The Court feels sure that counsel would not insist that the jury had no right to have anything to eat until they came to an agreement, and in order to give them a chance to

eat it is necessary for someone to be in contact with the jury."

The rule is the same applied in Exception II. See *Lowrey* v. *State* (Okla.) 197 P. (2nd) 637; 53 Am. Jur., Trials § 909; Anno. 41 A. L. R. (2nd) 261 with cases.

The more stringent rule, namely, that mere presence of the court officers in the jury room during deliberation rendered the verdict reversible, was applied in *People* v. *Knapp*, 42 Mich. 267, 3 N. W. 927, 36 Am. Rep. 438, and *People* v. *Chambers*, 279 Mich. 73, 271 N. W. 556. *Rickard* v. *State*, 74 Ind. 275, also cited by the respondent, in which the bailiff remained with the jury a large part of the time while they were deliberating and considering their verdict, presents a clear case for reversal.

The respondent further urges that "if the court should feel that this presumption of prejudice can be rebutted by the State by clear and convincing proof of the lack of prejudice," then the evidence here is not sufficient to permit a denial of the motion. "Clear and convincing proof" of no prejudice does not, in our view, require the consideration of the testimony of all jurors, or more evidence than was introduced before the presiding justice. He believed the testimony offered and his decision stands. We point out also that there was no request by the respondent for the taking of testimony of other jurors.

The separation and mingling cases cited by the respondent in which several members of the jury were interrogated, or in which available testimony was not produced, illustrate the application of the rule under varying circumstances. *State* v. *Hannah*, 122 W. Va. 719, 12 S. E. (2nd) 505; *Cole* v. *State*, 187 Tenn. 459, 215 S. W. (2nd) 824; *Chappell* v. *State*, 121 Tex. Crim. 293, 50 S. W. (2nd) 327. On the evidence the presiding justice was fully justified in finding no

suspicion of prejudice in the conduct of the officers in entering the jury room. Anno. 41 A. L. R. (2nd) 227-261.

Cases cited by the respondent to the effect that it is reversible error even for the presiding justice to enter the jury room while the jury is deliberating on their verdict are not in point. See *State* v. *Murphy*, 17 N. D. 48, 115 N. W. 84, 17 L. R. A. (NS) 609, 16 Ann. Cas. 1133; *Graham* v. *State*, 73 Okla. Crim. 337, 121 P (2nd) 308; Anno. 41 A. L. R. (2nd) 227, at 271.

Exception III is overruled.

### APPEAL

There is no doubt that the respondent shot and killed Annette Cross. The decisive question on appeal is whether the respondent was guilty of murder or manslaughter. The answer hinges on whether there was implied malice aforethought.

The reasons for the appeal are: (1) that the verdict is against the evidence, (2) that the verdict is against law, (3) that on all the evidence the jury was not warranted in finding the respondent guilty without reasonable doubt, and (4) that jury officers communicated with the jury.

The fourth ground has been discussed by us earlier in connection with Exceptions II and III.

The record shows no exceptions to the charge of the presiding justice nor in argument does the respondent before us raise any questions of law relating thereto. In our study of the case we are satisfied that the charge was proper. Further, there have been no exceptions on questions of evidence other than Exception I relating to the photographs brought forward to us.

The rule governing our consideration of the appeal has been stated in these words:

> "In this state the principles applicable to the review of civil trials on a general motion govern appeals in criminal cases. *State v. Dodge,* 124 Me. 243, 245; *State v. Stain et al,* 82 Me. 472, 489. And so in its review of criminal appeals, where the single question considered under the appeal was whether the verdict was against the evidence, this court has repeatedly ruled that the only question there to be determined was whether, in view of all the testimony in the case, the jury were warranted in believing beyond a reasonable doubt, and therefore in finding, that the respondent was guilty of the crime charged against him. *State v. Lambert,* 97 Me. 51, *State v. Mulkerrin,* 112 Me. 544; *State v. Howard,* 117 Me. 69; *State v. Pond,* supra; *State v. Dodge,* supra."

*State* v. *Wright,* 128 Me. 404, 406, 148 A. 141.

In the *Wright* case it was pointed out that the review was not there limited to the single question of whether the verdict was against the evidence and the court proceeded to sustain the appeal for the reason that the verdict was based upon a misconception of the law. "Such a verdict is against the law, and to allow it to stand is not justice." *State* v. *Wright, supra,* at p. 407; *State* v. *Rainey,* 149 Me. 92, 97, 99 A. (2nd) 78.

The rules governing the finding of murder under our statute have been well established over many years. In *State* v. *Turmel,* 148 Me. 1, 6, 88 A. (2nd) 367, Justice Thaxter gave clearly and precisely the governing principles:

> "Murder under our law is the unlawful killing of a human being 'with malice aforethought, either express or implied.' Rev. Stat. 1944, Ch. 117, Sec. 1. Malice aforethought does not necessarily mean that there must be specific intent to kill but our court has laid down the rule in the case of *State v. Knight,* 43 Me. 11, 137, as follows: 'But in all cases where the unlawful killing is proved, and there is nothing in the circumstances of the case as

proved, to explain, qualify or palliate the act, the law presumes it to have been done maliciously; and if the accused would reduce the crime below the degree of murder, the burden is upon him to rebut the inference of malice, which the law raises from the act of killing, by evidence in defence.' And Chief Justice Shaw, in *Commonwealth v. Webster*, 5 Cush. 295, 322, lays down the ancient rule as taken from East's Pleas of the Crown as follows: 'but he who wilfully and deliberately does any act, which apparently endangers another's life and thereby occasions his death, shall, unless he clearly prove the contrary, be adjudged to kill him of malice prepense.' Manslaughter is the unlawful killing of a human being without malice aforethought, express or implied. Rev. Stat. 1944, Ch. 117, Sec. 8. Such killing may take place in various forms. It may be done in the heat of passion or on sudden provocation, or it may even be accidental."

In *State* v. *Arsenault*, 152 Me. 121, 125, 124 A. (2nd) 741, Chief Justice Fellows again set forth the principles with particular reference to intoxication in these words:

"Where there are statutory degrees of murder (as formerly in Maine) intoxication may sometimes reduce from first to second degree murder. Intoxication will not reduce to manslaughter where there is malice aforethought, and where there is no provocation or sudden passion. Voluntary intoxication is no excuse for murder. 'Voluntary intoxication is not an excuse, or justification, or extenuation of a crime.' *Com. v. Hawkins*, 3 Gray (Mass.) 463, 466; *Commonwealth v. Malone*, 114 Mass. 295. See 26 Am. Jur. 233, Sec. 116, 'Homicide' and cases cited; 40 C.J.S. 830, Sec. 5, 'Homicide' and the cases there cited.

"When the fact of killing is proved and nothing further is shown, the presumption of law is that it is malicious and an act of murder. *State v. Knight*, 43 Me. 11; *State v. Neal*, 37 Me. 468; *State v. Turmel*, 148 Me. 1; *Commonwealth v. York*, 9

Metc. (Mass.) 93; *Commonwealth v. Webster*, 5 Cushing (Mass.) 295.

" 'Malice,' as used in the definition of murder, does not necessar*i*ly imply ill will or hatred. It is a wrongful act, known to be such, and intentionally done without just and lawful cause or excuse. *State v. Merry*, 136 Me. 243, 8 Atl. (2nd) 143; *State v. Knight*, 43 Me. 11; *State v. Robbins*, 66 Me. 324.

"Voluntary intoxication is not an excuse for crime, *except in those cases where knowledge or specific intent are necessary elements.* 'Intoxication does not make innocent an otherwise criminal act.' *State* v. *Siddall*, 125 Me. 463, 464."

In *State* v. *Merry*, 136 Me. 243, 8 A. (2nd) 143, the court said, at p. 247:

"It may be noticed here, quite as well as anywhere, perhaps, that, in murder, malice aforethought must exist, and, as any other elemental fact, be established, not beyond all possible doubt, but beyond a reasonable doubt; malice is not limited to hatred, ill will or malevolence toward the individual slain; it includes that general malignancy and disregard of human life which proceed from a heart void of social duty, and fatally bent on mischief."

See also *State* v. *Knight*, 43 Me. 11; *State v. Neal*, 37 Me. 468; *Com. v. Webster*, 5 Cush. 295, 322.

We start, therefore, with a presumption that the killing was with implied malice aforethought. Unless the respondent must be said to have overcome this presumption as a matter of law, then the finding of the jury stands.

It is unnecessary to review the record in detail. The jury could have found the following essential facts:

The deceased was the mistress of the respondent for about two years prior to her death. With her young daugh-

ter she had lived from time to time with the respondent at an apartment on Hines Alley in Lewiston, and for a period of about three months just prior to her death on a farm in Minot. The respondent made arrangements to leave the farm and rented an apartment on Lincoln Street in Lewiston. There the deceased with her daughter was staying on the night of December 28, 1959. The respondent had been drinking during the day and evening and had in his possession a loaded .22 rifle. The young child went to bed in the only bed in the apartment. Sometime after midnight the respondent pointed his rifle at the deceased and shot her in the head as she was standing a short distance from him at the sink in the kitchen and so caused her death. He then drove his car to the office of the sheriff in Auburn and said that he had "shot a woman." Lewiston police officers within minutes were at the apartment and found the victim with her head in the sink. She was taken to the hospital where she died. The respondent gave a written statement at the sheriff's office describing his relationship with the deceased at the time of the killing, reading in part:

> "Annette had pointed the gun at me a couple of times but she did not know whether it was loaded or not, I knew it was loaded and when she went to the sink to look out the window, I picked up the gun and let her have it. I aimed at her head, I just wanted to hurt her, not necessarily kill her, as she wanted everything that I earned. I pulled the trigger and let her have it. When she slumped down into the sink, I jacked out the shell went down and got into my car and drove to the Sheriff's Dept. If she comes out of it she will think another time before she starts beating people out of everything."

His explanation on the stand was in these words:

> "Q    And you just swung toward the cupboard?
> "A    I took just about two steps toward the cupboard and I had the gun this way. (Indicating with arms)

"Q    Where were you looking then?

"A    Down at the cupboard.

"Q    What happened then?

"A    Well, she said, 'I still am going to have you arrested, you cheap s.o.b.' and I looked at her like that, and when she said 's.o.b.' I went mad like that and pulled the trigger, I imagine with my reflexes."

\* \* \* \* \* \* \* \*

"Q    Now as to this phrase: 'I aimed at her head.' What do you mean by that? What did you mean by that?

"A    Well, that was just a story I made up. I had the gun this way and it was pointed this way; she was on the left and I was on the left.

"Q    It was pointed towards her?

"A    It was pointed towards her or the ceiling— or I mean the wall.

"Q    Did you deliberately aim it, as it says here, 'I aimed at her head.'

"A    No, sir.

"Q    'After I aimed at her head I just wanted to hurt her, not necessarily kill her, as she wanted everything that I earned.' Are those your words?

"A    Those are my words, yes, I said it.

"Q    Are they what you meant?

"A.    No.

"Q    What did you mean?

"A    Well, I just was tired and wanted to go to bed.

"Q    Then the next words are 'I pulled the trigger and let her have it.' Are those your words?

"A    Yes, they are, but I didn't mean them.

"Q    What did you mean?

"A    Well, I was tired and wanted to go to bed."

\* \* \* \* \* \* \* \*

"Q    And what exactly did she say to you when you

had taken the rifle away from her the second time and had turned around by the cupboard?

"A   I was by the cupboard.

"Q   You were by the cupboard and she was by the sink?

"A   She was by the sink.

"Q   What did she say?

"A   She said, 'I am going to have you arrested for assault and battery, you dirty old s.o.b.'

\* \* \* \* \* \* \* \* \*

"Q   You said in your statement she was over looking out the window?

"A   It looked like it.   She started to look out the window and then she called me that again. The way my reflexes was I don't know how.

"Q   Did this thing anger you so much you pulled the trigger?

"A   My reflexes.   She was going to have me arrested for assault and battery, which I had never done."

\* \* \* \* \* \* \* \* \*

"Q   After this thing happened did you go over and look at her?

"A   No.   After the gun went off it surprised me. She went like this and bowed her head, and her head went right on top of the faucet.   It probably took about three or four seconds.   I says, 'What did I do now?'   I jacked the shell, threw the gun in the corner and grabbed my coat and started running out and got down half way when I got my coat on."

\* \* \* \* \* \* \* \* \*

"Q   You didn't go up to her and try to help her in any way?

"A   Well, I didn't dare to, because I thought I had creased her or something, and you ain't supposed to touch anybody, it says in medical books, go for help, that is all."

We are satisfied from our study of the record that the jury was justified in returning a verdict of murder. The charge, to which no exceptions were taken, covered the rules largely in the language from our Maine cases cited *supra*.

We have here a respondent who sends a bullet into the brain of the deceased; a man who had "that general malignancy and disregard of human life which proceed from a heart void of social duty, and fatally bent on mischief." *State* v. *Merry, supra.* If we take the evidence of the respondent, we have a man quarreling with his mistress who pointed a rifle at him and called him names as shown by the extract of evidence above. These were not acts or words sufficient to compel a finding as a matter of law that the respondent killed in the heat of passion and under sudden provocation. He gains, as is shown by the *Arsenault* case, *supra,* no aid from the fact that his condition was affected or may have been affected by his voluntary consumption of beer.

The issues raised by the introduction of colored photographs have been discussed in connection with Exception I and we found no error of law in their introduction. The respondent urges in his appeal that the statement signed by him in the sheriff's office was taken under circumstances which prohibited its use against him. There was much evidence of the conditions surrounding its taking. The jury was under no obligation to believe that the respondent was not physically and mentally able to state the truth, or that he was in any way compelled to do otherwise, or was misled into giving damaging statements.

The respondent, fifty years of age, perhaps influenced by drink, angered, so he says, by his mistress whom he wished to discard, took his rifle, shot and killed the deceased. It was for the jury to say whether the act was "in the heat of

passion, on sudden provocation, without express or implied malice aforethought, . . " and thus manslaughter. R. S., c 130, § 8. The verdict was of murder and must stand.

The entry will be:

> *Exceptions overruled.*
>
> *Appeal dismissed.*
>
> *Motion for new trial denied.*
>
> *Judgment for the State.*
>
> *Case remanded for sentence.*