STATE, RESPONDENT, v. HARDEE, APPELLANT.

(No. 1,879.)

(Submitted April 3, 1903.   Decided April 11, 1903.)

*Homicide — Evidence — Proof of Venue—Homicidal Mono-
mania—New Trial—Newly Discovered Evidence—Cumula-
tive Evidence.*

1.  In a prosecution for murder, evidence considered, and *held* to show that
    the crime was committed in the county alleged in the indictment.
2.  In a prosecution for murder, evidence considered, and *held* to show too
    much deliberation to be the result of any sudden impulse, and to be incom-
    patible with the theory that the defendant was afflicted with homicidal
    monomania.
3.  Where, in a prosecution for murder, the insanity of defendant was placed
    in issue, in support of which defendant called witnesses who testified, and
    the facts to be proved by newly discovered evidence were merely cumu-
    lative on that issue, and were not such as to make it clearly probable that
    a different result would follow another trial, nor was it shown that they
    could not have been produced on the former trial by the exercise of reason-
    able diligence, a new trial was properly refused.

*Appeal from District Court, Valley County; John W. Tattan, Judge.*

WILLIAM E. HARDEE was convicted of murder. From a judgment sentencing him to death, and from an order denying him a new trial, he appeals. Affirmed.

*Mr. George E. Hurd,* and *Messrs. Nolan & Loeb,* for Appellant.

If there is any evidence to establish the venue and the question arises as to its sufficiency, it cannot be considered upon an appeal from the judgment, but where there is no evidence its absence becomes a question of law and is reviewable upon such an appeal. (Penal Code, Section 2321; *Emerson* v. *Eldorado Ditch Co.,* 18 Mont. 247; *Withers* v. *Kemper,* 25 Mont. 432.)

In criminal prosecutions the venue is a jurisdictional fact and must be proved. (*Brooks* v. *State,* 120 Ala. 386; *Forehand* v. *State,* 53 Ark. 46; *Moore* v. *People,* 150 Ill. 405; *Harlan* v. *State,* 134 Ind. 339; *State* v. *Young,* 99 Mo. 284; *Early* v. *Com.,* 93 Va. 765.)

The proof of venue must affirmatively appear from the record on appeal. (*Hite* v. *State,* 9 Yerger, 357; *Terry* v. *State,* 22 Tex. App. 679.)

When a bill of exceptions purports to set out all the evidence and the venue is not established, judgment will be reversed. (*People* v. *Griffith,* 122 Cal. 212; *Cathorn* v. *State,* 63 Ala. 157; *Harrison* v. *State,* 3 Tex. App. 558.)

· The affidavits as to newly discovered evidence are uncontradicted. Under the peculiar conditions of this case the affidavits disclose a meritorious case where the application for a new trial upon this ground should be favorably considered. (Thompson on Trials, Sec. 2762; *State* v. *Brooks,* 23 Mont. 146; *Anderson* v. *State,* 43 Conn. 514; *Dennis* v. *State,* 103 Ind. 142.

*Mr. James Donovan, Attorney General,* for the State.

A new trial will not be granted on the grounds of newly dis-

covered evidence unless such evidence is material and would be likely to change the result, if the motion were allowed. (*Territory* v. *Bryson,* 9 Mont. 42, 22 Pac. 147; *People* v. *Demasters,* 109 Cal. 608; *Shafer* v. *Willis,* 124 Cal. 36; *People* v. *Warren,* 130 Cal. 683; *Davis* v. *State,* 51 Neb. 360; *Linscott* v. *Insurance Co.,* 88 Me. 497; *Smith* v. *State,* 143 Ind. 685.)

If the new evidence is cumulative, a new trial will not be granted. (*Morse* v. *Swan,* 2 Mont. 307; *People* v. *Kloss,* 115 Cal. 567; 1 Bish. New Criminal Procedure, Sec. 1279; *Norfolk* v. *Johnakin,* 94 Va. 285; *Sisler* v. *Shaffer,* 43 W. Va. 769; *Condan* v. *Mead,* 172 Ill. 13; *Allbright* v. *Hanna,* 103 Ia. 98; *People* v. *Brittan,* 118 Cal. 469; *Kuhlman* v. *Burns,* 117 Cal. 409; *Niosi* v. *Empire Steam Laundry,* 117 Cal. 257.)

A person seeking a new trial on the ground of newly discovered evidence must show that he could not have discovered the evidence and produced it on the trial by any reasonable diligence on his part. Strict proof must be made on this point, and facts, not conclusions, stated in the moving affidavits from which the court may draw the conclusion that due diligence was used. (*Bradley* v. *Norris,* 67 Minn. 48; *Lukens* v. *Garret,* 2 Kans. App. 722; *Butter* v. *Vassault,* 40 Cal. 74; *People* v. *Ching Hing Chang,* 74 Cal. 389; *People* v. *Urquidas,* 96 Cal. 239.)

The moving party must show by his own affidavit that the new evidence was not known to him at the time of the trial. Upon that question the affidavits of other persons are not sufficient. (*Arnold* v. *Skaggs,* 35 Cal. 684.)

An application for a new trial on the ground of newly discovered evidence should be regarded with distrust and disfavor. (*People* v. *Howard,* 74 Cal. 547; *People* v. *Sutton,* 73 Cal. 243; *Tibet* v. *Tom Sue,* 125 Cal. 544.)

And a party who relies upon that ground must make a strong case, both in respect to diligence on his part in preparing for the trial, and as to the truth and materiality of the newly discovered evidence, and that, too, by the best evidence

obtainable, and if he fails in either respect his motion must be denied. (*People* v. *Freeman,* 92 Cal. 359.)

The granting of a new trial on this ground is largely a matter of discretion, the exercise of which will not be disturbed by the appellate court except in the case of an abuse clearly disclosed by the record. (*O'Rourke.* v. *Vennekohl,* 104 Cal. 254; *Heintz* v. *Cooper,* 104 Cal. 668; *People* v. *Rushing,* 130 Cal. 449; *People* v. *Mitchell,* 129 Cal. 584.)

MR. COMMISSIONER POORMAN prepared the opinion for the court.

On the 26th day of September, 1901, an information was filed against the defendant in Valley county, charging him with the crime of murder in the first degree, for killing Charles Snearly in that county.

The defendant was apprehended and arrested on or about the 11th day of September, and placed in jail at the county seat of said county on or about the 12th day of the same month, where he remained continuously until the time of his trial. On November 27, 1901, counsel for the defense called the attention of the trial court to the fact that the defendant was, in his judgment, mentally incompetent to furnish his counsel with any of the facts necessary in the preparation of his defense. The court thereupon made an order requesting that Drs. Hoyt, Clay, Meminger, and Atkinson, four regularly licensed and practicing physicians in said county, examine the defendant as to his sanity. This examination was made on the 28th day of November, and the physicians so appointed reported to the court that they found the defendant physically broken down from the use of morphine and opium, but that he was at the time of said examination mentally sound. The trial was then proceeded with, the defense being insanity; it being sought to be shown that the defendant's mental derangement took the form of homicidal monomania. A verdict of guilty of murder in the first degree was rendered. Judgment sentencing de-

fendant to death was entered. The motion was then made for a new trial on the ground of newly discovered evidence, which motion was overruled. From this judgment, and from the order overruling the motion for a new trial, the defendant appeals.

Two assignments of error are contained in the record: First, that the record fails to show that the offense was committed in Valley county; second, that the court erred in refusing to grant a new trial on the ground of newly discovered evidence.

1. The record before us contains all the evidence in the cause. On the first assignment of error, we find these material facts established: Mrs. Alice Smith, a witness on behalf of the state, testifies: "I am the wife of J. P. Smith, called 'Doc Smith.' My residence is about eighteen or twenty miles north of Culbertson, in this county and state. I was at home at my house on the 9th of September of this year, and know the defendant, William E. Hardee. I know Charles Snearly." The witness then proceeds to relate the circumstances of the killing, which occurred there on the evening of that day. She further says that she started to Culbertson that evening with the men who were taking the deceased in, and continued with them until she met her husband, when she came back home with him. Fred Wagar, another witness on the part of the state, testifies: "My home is in North Dakota. The early part of last September I was in the state of Montana, on Doc Smith's ranch, near Culbertson, in this county." The witness then proceeds to detail the circumstances of the killing as it occurred there at Smith's place on the 9th day of September. J. P. Smith testifies: "My name is J. P. Smith. I live fifteen miles from Culbertson. Mrs. Smith, a witness in this case, is my wife. I live north of Culbertson, in Valley county, state of Montana. On or about the 9th of September of this year I was at Culbertson. I went home that night or the next morning. On the way home I met the wagon bringing Snearly into town. I went on home, and my wife did also. * * * When I got home that night I don't think I went into that west

bedroom. I think I went in first next morning. I think Mr. Ford was with me. There was a whole lot of blood in there." The defendant also testifies, after repeatedly stating that he was at Doc Smith's ranch: "I had trouble with Snearly. I killed him. I do not know when I killed him. I killed him because he jumped onto me, I guess, at Doc's." This testimony clearly establishes the fact that this homicide was committed at the ranch of J. P. Smith, in Valley county, Montana.

2. The defendant's contention that he is entitled to a new trial on the ground of newly discovered evidence, establishing the fact that he was insane at the time of the commission of this offense, calls for a brief review of the actions of the defendant at the time of, and subsequent to, the killing. It appears from the testimony: that the defendant and the deceased came to the ranch of Mr. Smith some time in August, 1901, and, after remaining there several days, went away. They returned there on the morning of the 9th of September. The defendant's first inquiry of Mrs. Smith was whether the deceased had said anything to her about their trip. The defendant then told Mrs. Smith that they had been out after some horses, and were driving them to market; that they had been without food for some time; that he had shot a chicken; and that the boy (referring to the deceased, who was about 17 years of age) was pretty hungry, and insisted upon stopping to cook the chicken; that the defendant insisted upon continuing their drive of the horses until 12 o'clock, but that, at the instance of Snearly, they stopped and cooked the chicken, and while they were doing it the horses got away from them. This made the defendant very angry, and he threatened to kill Snearly, and stated that he did not kill him at that time because the boy begged so hard, and he thought he would wait until he got where he could have a decent burial. That in the afternoon of September 9th the defendant, the deceased, and one Jackson went hunting, returning to Mr. Smith's place in the evening. That the deceased then busied himself with cleaning and oiling a revolver, and, after he had finished, rubbed his oily hands

through the hair of the defendant. This did not appear to anger the defendant at the time, and soon after the defendant, who was sitting down, got up, took the revolver from where the deceased had laid it, carried it out into the kitchen, and laid it down. The revolver was unloaded. The deceased and defendant then went into the bedroom, where they apparently had some disagreement. The defendant soon come out in a hurried manner, rushed into the kitchen, picked up the pistol, and, on his way back to the bedroom, picked up a double-barreled shotgun. Passing into the room where the deceased was standing, he threw the pistol on the floor at the feet of the deceased, and said, "Pick it up, if you have any nerve," and almost immediately fired one barrel of the shotgun at the deceased, inflicting the wound from which deceased died on September 11, 1901. Defendant remained there for some little time, and every few minutes would ask the deceased if he wanted the other barrel, and said to the deceased, "I promised this to you." The deceased replied, "Yes; but I did not think you would do it," when defendant said, "You ought to know that I am a man of my word. You found out that I was." A little later, when those present proposed taking the wounded man to Culbertson, the defendant objected, and said, "You had better not take him until the coroner comes," but afterwards gave his consent. Snearly repeatedly called for morphine, and defendant finally gave him some that he had with him; and afterwards, when Snearly asked for more morphine, he gave a spoonful of it to Mrs. Smith, told her to give it to Snearly, and said, "That will fix him, sure." Defendant then ordered the men who were present to saddle up the best horse Doc (meaning Smith) had, which defendant then mounted and rode away, following the wagon in which they were conveying Snearly for some distance. Prior to leaving the Smith residence he asked one of the men if Snearly was shot bad, and on being informed that he was, and that he could not live, defendant said: "That is good enough for me. If I thought he was not killed, I would shoot him again." After Snearly had been

placed in the wagon, he asked to have his boots removed. The defendant then remarked: "That is good enough for me. He is gut-shot, and will die before we get him to town." The next night after the killing, defendant, while at the house of Mr. Olson, heard Mr. MacDonald, who had just come from Culbertson, remark that the boy (meaning the deceased) was dead, or not expected to live. Defendant immediately asked: "Did the boy say anything—tell anything?" On being informed that he had not, he expressed his satisfaction, and said he hoped that he would live. Defendant was taken to jail, and, being addicted to the use of opium, was placed under the care of the county physician. Since the defendant has been in jail he has frequently talked to the sheriff about the killing of Snearly, and expressed himself as being very sorry, and about "feeling very badly" on account of it. On the trial of the case, the defendant, in speaking of deceased, says: "I have seen him down there lots of times in the jail. He has been there lots of times, and I have seen him once in a while. I saw him two or three days ago, and last night he just came there and looked in and went away. I told him to get away." Further on the defendant, in testifying, says: "Since I have been in jail I have thought about this Snearly matter a great deal. I dream about it every night. I see Snearly in my dreams. He won't talk to me. I talk to him sometimes."

The circumstances and facts attending this homicide show too much deliberation to be the result of any sudden impulse, but appear, rather, to be the result of anger occasioned by the deceased causing the defendant to lose the horses, and a fear on the part of defendant that the deceased might make some remark relative to some past transaction. This is evident from the solicitude of the defendant as to whether or not the deceased had "said anything—told anything." The fact that the defendant has evidently been brooding over this affair, and has expressed himself as very sorry that he had killed Snearly, is not compatible with the theory that the defendant was at the time of the killing afflicted with homicidal monomania. The

testimony of the physicians on this point is to the effect that if a man is a homicidal monomaniac, and in that condition kills another, he would not afterwards be sorry or grieve over his act. It is further in evidence that Dr. Hoyt saw and examined the defendant within three or four days after the commission of the homicide, and that the defendant has been in his care at all times since; that he has never been able to detect any signs of insanity about defendant. Defendant was further examined by four physicians the day prior to his trial, who reported that he was at that time mentally sound. It is further stated in the testimony of the physicians that, if defendant had been the victim of mania or of insanity in any of its forms, it would not have passed away in the interval between the killing and the time when he was placed under the care of Dr. Hoyt. Sheriff Griffith also testified that during the time that the defendant has been in his care he has detected no signs of insanity, that the defendant has been at all times able to converse upon matters, and that it was only when placed upon the witness stand to give testimony in this case that his memory failed him. Mr. and Mrs. J. P. Smith also testified that they knew the defendant—had known him for some time prior to the homicide; that he had frequently been about their home; that they had never thought him insane, nor detected signs of insanity about him. One of the physicians testified that at the examination on the 28th of November the defendant appeared to be afflicted with melancholia, which fact is also a refutation of the homicidal maniac theory, for it is a part of the evidence of the physicians that melancholia is a milder form of insanity, and that a person afflicted with homicidal monomania would not afterwards pass into a condition of melancholy.

The facts which defendant wishes to prove by his newly discovered evidence are cumulative, tending to prove the allegations of mental incapacity, which became an issue on the trial, and in support of which defendant called witnesses who testified, and are not such as to make it clearly probable that a different result would follow another trial; nor does it appear

that the testimony could not have been produced upon the former trial by the exercise of reasonable diligence, for the testimony produced upon the former trial shows that the defendant was mentally capable at all times from the day when he shot Charles Snearly until the time of his trial of giving his counsel all the required information necessary in the preparation of his defense.   (*Territory* v. *Bryson*, 9 Mont. 32, 22 Pac. 147; *State* v. *Brooks*, 23 Mont. 146, 57 Pac. 1038.)

It appears from the record that the defendant had a fair and impartial trial, that he was ably defended, and that the court did not in any manner abuse its discretion in overruling the motion for a new trial.

We therefore recommend that the judgment and order appealed from be affirmed.

PER CURIAM.—For the reasons stated in the foregoing opinion, the judgment and order are affirmed.

MR. JUSTICE MILBURN did not hear the argument in this case, and therefore takes no part in this decision.

(Submitted April 3, 1903.   Decided April 11, 1903.)