STATE, RESPONDENT, *v.* POOLE, APPELLANT.

(No. 5,271.)

(Submitted May 26, 1923. Decided July 3, 1923.)

[216 Pac. 798.]

*Criminal Law—Homicide—Dying Statements—Evidence—Sufficiency—New Trial—Newly Discovered Evidence—Courts—Power to Amend Records After Appeal.*

Courts—Power to Amend Records.
    1. Every court of record has the inherent right to cause its acts and proceedings to be set forth correctly in its records and minutes by amendment to conform to the truth not only in civil cases but in criminal ones as well, whether an appeal has been taken or not.

Same—Power to Amend Records After Appeal—Limitation.
    2. While after appeal has been taken the court loses jurisdiction of the case, it does not of its records, and where by misprision or mistake or inadvertence of the clerk a matter has been omitted from the records, the correction may be made, provided it goes no further than to show the true history of the proceedings before appeal, but the court may not by amendment change the status of the case so as to interfere with the substantial rights of the parties.

Homicide—Amendment of Minutes After Appeal—Supplemental Transcript—Right to File.
    3. Under the above rules, *held,* that where the minutes of the court in a criminal prosecution failed to show the fact that the defendant and his counsel were present at all stages of the trial, a fact not disputed by defendant, and the court after appeal taken corrected its minutes so as to state the truth, a supplemental transcript incorporating the corrected minutes could properly be filed in the supreme court, no substantial right of the defendant having been affected thereby.

Same—Dying Statement—Evidence—Sufficiency.
    4. In a prosecution for murder in the first degree, in which conviction rested mainly upon the dying statement of deceased, evidence *held* sufficient to warrant conviction, and that defendant's contention

[68 Mont. 178.]

that the physical facts alone disproved the truth of the statement is not supported by the proof.

Same—New Trial—Newly Discovered Evidence—Proper Denial.

5. *Held,* that the court did not abuse its discretion in disregarding an affidavit filed by a son of defendant after conviction, in support of a motion for new trial on the ground of newly discovered evidence, reciting that he and not his father had done the killing and that he had not told of it to anyone because of fear and his belief that conviction could not be had, the court having been justified in its action in view of all the facts and circumstances in the case before it which rendered it improbable that a different result would be reached upon a retrial.

*Appeal from District Court, Hill County; Charles A. Rose, Judge.*

WILSON B. POOLE was convicted of murder in the first degree, and appeals. Affirmed.

*Mr. Victor R. Griggs* and *Mr. Ed. M. Allen,* for Appellant, submitted a brief; *Mr. Griggs* argued the cause orally.

*Mr. Wellington D. Rankin,* Attorney General, *Mr. A. F. Lamey,* County Attorney of Hill County, and *Mr. Max P. Kuhr,* for Respondent, submitted a brief; *Mr. Kuhr* argued the cause orally.

MR. CHIEF JUSTICE CALLAWAY delivered the opinion of the court.

The defendant, having been convicted of the crime of murder in the first degree, moved for a new trial, which was denied, whereupon he appealed to this court.

1. After the appeal was perfected, the state asked leave to [1–3] file a supplemental transcript consisting of corrected minutes of the lower court showing that at all stages of the trial the defendant and his counsel personally were in court, the original minutes of the court, and consequently the original transcript, having failed to show the fact. The defendant opposes the filing of the supplemental transcript upon the ground that upon the face of the original transcript the appellant is entitled to a new trial, and his counsel puts the question: "Can the district court, after an appeal is taken,

so correct and add to its record as to change the *status quo* of the appellant's rights upon the appeal?" He insists that this court must pass upon the record as it existed at the time the motion for a new trial was denied.

It appears that after notice to defendant's counsel, and upon a proper showing made, the district court amended its minutes to show that the defendant and his counsel were actually present at all times during the trial. It is not contended that in amending its minutes the court did not state the facts. In other words, the defendant does not contend that he was not actually present in person and by counsel at all times during the trial, but simply that the minutes of the court as they appeared when the motion for a new trial was heard and denied did not thus show affirmatively.

There is no doubt that every court of record has the inherent right to cause its acts and proceedings to be set forth correctly in its records. (*Currey* v. *Butte Electric R. Co.*, 60 Mont. 146, 199 Pac. 243.) This is the rule in civil actions and there appears to be no reason why it is not applicable in criminal ones. (*People* v. *Ward*, 141 Cal. 628, 75 Pac. 306; *Kaufman* v. *Shain*, 111 Cal. 16, 52 Am. St. Rep. 139, 43 Pac. 393; *In re Tucker*, 4 Okl. Cr. 221, 111 Pac. 665; *In re Breeding*, 75 Okl. 169, 182 Pac. 899; *Benedict* v. *People*, 23 Colo. 126, 46 Pac. 637; *Mulligan* v. *People*, 68 Colo. 17, 189 Pac. 5; *State* v. *Winter*, 24 Idaho, 749, 135 Pac. 739; *State* v. *Gilbert*, 55 Or. 596, 112 Pac. 436; *Mitchell* v. *State*, 45 Fla. 76, 33 South. 1009; *State* v. *Hart*, 133 La. 6, 62 South. 161.) Inasmuch as the court retains possession of its minutes and records it has the power to correct and amend the same, so as to make them conform to the truth, whether an appeal is taken or not. (15 C. J. 977.) While, appeal being taken, the court loses jurisdiction of the case, it does not of its records, and where by reason of misprision of the clerk or where through inadvertence or mistake some matter has been omitted from the record, the correction may be made. The power of correction is confined, however, to showing truly the history of the

proceedings before the appeal, and the lower court has no jurisdiction pending an appeal, by amendment of its records or proceedings, or otherwise, to change the status of the case, so as to interfere with the substantial rights of the parties. (3 C. J. 1265; *Bull* v. *International Power Co.,* 84 N. J. Eq. 209, 93 Atl. 86; *Guernsey* v. *Miller,* 80 N. Y. 181; *Andersen* v. *Lederer,* 53 Neb. 128, 73 N. W. 664; *Fay* v. *Stubenrauch,* 141 Cal. 573, 75 Pac. 174; *Channel* v. *Merrifield,* 206 Ill. 278, 69 N. E. 32.) The trial court having had the right to amend its minutes so as to state the truth, the precise question now presents itself as to whether the amended record may be filed in this court. It would be a strange commentary upon justice if this court should refuse to permit the truth to be shown, no question as to its jurisdiction or power so to do being involved, and it appearing affirmatively that no substantial right of the defendant will be affected in any way. The state's motion for leave to file the amended transcript is granted. (*Pappot* v. *Howard,* 154 Ala. 306, 45 South. 581; *Breene* v. *Booth,* 3 Colo. App. 470, 33 Pac. 1007; *Judson* v. *Blanchard,* 3 Conn. 579; *Adams* v. *Higgins,* 23 Fla. 13, 1 South. 321; *Culbertson* v. *Salmyer,* 111 Iowa, 447, 82 N. W. 925; *Chambers* v. *Swango,* 22 Ky. Law Rep. 923, 59 S. W. 20.)

2. The crime for which the defendant was convicted arose [4] out of the shooting of Joe Oswald on the evening of July 11, 1922. Oswald lived on his farm about thirty-five miles northwest of Havre. The defendant, Wilson B. Poole, known among his neighbors as Bill Poole, was living as a tenant on what is known as the Kemp or Simpson place, about six miles northwest of the Oswald place. He had a family, consisting of a wife and five children, including a seventeen year old son, Howard Poole. The defendant owned a homestead located north and east of the Oswald place, the buildings on the Poole homestead being about three-quarters of a mile northerly from Oswald's house. A road running east and west passed the Pioneer schoolhouse, about half a mile farther east the Oswald house, and a half mile still farther

east intersected a road running north and south which the
witnesses called the lane road. At the point of intersection
on the north defendant had placed a barbed wire gate across
the lane road. Just northeasterly of this point there was a
field which Howard Poole had planted to wheat, but the crop
had been ruined by hail recently. Up the lane road from the
gate about a quarter of a mile a road, called the Lake trail,
took off to the northwest. This ran close by the buildings on
the Poole homestead and continued in the direction of the
Simpson place.

Essentially, the defense was based upon an alibi, and an
attempt to show that the shooting was done by the defendant's
son Howard. Before proceeding to a narration of the moving
events which make up the story of the tragedy and trial it
is well to note the fact that Poole and Oswald had not been
on friendly terms for a number of years. About two years
before the shooting they had engaged in an altercation of some
kind. About the first of May, 1917, so a witness testified,
Poole said he was going to kill Joe Oswald, skin him and hang
his hide on the fence along the road. This the defendant de-
nied. Another witness said that on or about the 23d of June,
1922, the defendant told him there were two men he was going
to get, Jess Miller and Joe Oswald. This testimony was denied
by defendant as well as by another witness who was said to
have been present at the alleged conversation. Whether the
statements were made or not, there does not seem to be any
doubt that ill feeling existed between the two men.

Oswald left his farm about 6 o'clock in the evening of Tues-
day, July 11, going to the farm of a neighbor which is about
a mile and a half in an easterly direction from the Oswald
home, for the purpose of returning a hayrake. He left the
neighbor's place for home about half an hour before sundown.
As he reached the vicinity of the wire gate he found that three
of his oxen had broken into the Howard Poole field. Leaving
his team, he went into the field and drove the oxen out. As
he was doing this he saw the defendant and Freddie Poole,

a boy ten years old, in the grain-field in a northerly or north-easterly direction from him about 150 yards distant. Oswald then got in his wagon and drove home. Later, seeing the oxen turn back into the field he ate a hasty lunch and went back to the Howard Poole field on foot to drive the oxen from the field again. When he got near the lane, he cut diagonally across the field on his left. Seemingly he crossed the lane road 175 feet from the gate. Just how far he went from there is not clear, but he "turned to drive the cattle, or oxen, as he called them, out again, and when a couple of rods from the gate, across the line, there was a shot fired, and the ball passed over his head. He said he looked around and another shot was fired and it hit him in the side or the back."

The foregoing is from the dying statement made by Oswald on Friday evening when in a hospital at Havre. It was made in the presence of the county attorney, the sheriff and two deputy sheriffs, one of whom was the witness Herron, whose language is quoted. Oswald said Poole, when he fired the shots, was fifty or sixty yards distant and after shooting went north; Poole was alone. As Herron remembered the testimony Oswald said the shooting was about sundown. During his statement Oswald was asked this question: "Who done the shooting? Do you know?" To which he answered: "Yes." "Who was it?" "It was Bill Poole." His questioner then said: "Mr. Oswald, isn't it just possible that you might be mistaken in the party that done the shooting?" And he said: "No; I am not mistaken. I know Bill Poole, and I seen Poole shoot me, and it was Poole that shot me." Asked again if he could not be mistaken as to who shot him, he said: "No; I swear by the stars, my wife, and my God that it was Bill Poole." To the sheriff Oswald made this declaration, and this was the manner of it: "He put his hand on his breast and said: 'By my wife and children and by my God I swear that Poole shot me.'" As a part of his dying statement, Oswald said he thought he was going to die and requested that his wife and children might come in as he should like to see them

before he passed away. The next morning, about 9 o'clock, he repeated practically what he had said the night before. That afternoon he died.

Upon this dying statement the judgment of conviction mainly rests. Counsel for defendant admits defendant is guilty if this statement is true. The circumstances attending the statement seem to have been of unusual solemnity. Looking toward the mystery into which he was so soon to enter, calling upon those dearest to him on earth and appealing to the Infinite for the truth of what he affirmed—under these circumstances it is incredible that Joe Oswald willfully falsified.

But counsel argues that upon the physical facts alone the statement could not have been true. This assertion is based, first, upon the hypothesis that it was so dark when Oswald was shot that he could not have recognized a man fifty or sixty yards away. Upon being shot, Oswald walked directly home, a half mile, and told his wife what had happened. Her son, Joe Oswald, was at church at the Pioneer schoolhouse. Two other children were in bed. The eldest of the two, Elizabeth, was told of the shooting and to go to the church for Joe. Elizabeth "didn't waste any time getting dressed," and went to the schoolhouse as fast as her legs could carry her, as she said. Church was just out. The services closed at 9:40, and at that time, according to the minister, Mr. Nelson, it was very light; he could have recognized a man 100 yards away. That night the sun set at 8:22 and the moon rose at 9, according to the testimony. The witness Hammon testified that it was light when he entered the church at or shortly before 9 o'clock. At that time he could have recognized a man a quarter of a mile distant. There was some contradictory testimony as to the character of the evening and upon the question of visibility; but the jury was fully warranted in believing that Oswald could have recognized Poole on that evening at the time of the shooting even if the men were 200 yards apart.

Again counsel for the defendant urges that, based upon the tracks found at different points in the Howard Poole field as well as in the lane road, and considering these with reference

to where a Winchester shell was found in the lane road, Oswald's statement could not have been true. Upon a careful analysis of all the testimony bearing on this point we fail to find any merit in this contention. Where the slayer stood when he fired the shots no one knows but himself. His tracks made on the occasion of the shooting were not traced at all. For aught that appears from the evidence of physical facts he may have been fifty or sixty yards away from Oswald when the shots were fired as Oswald related. The lane road was overgrown with thistles and weeds; footprints were not discernible except in the wagon ruts. Assume that Oswald's slayer intended to kill him; can it be supposed that this murderer did not take the ordinary precaution of walking where his tracks might not be traced? The only tracks made by defendant which were identified were those made by him when he was with his son Freddie on the occasion when Oswald first drove the cattle from the wheat-field. The Winchester shell was found in the wagon rut at a point somewhere from 150 to 200 yards northerly from the lane gate. By reason of marks upon it similar to those appearing upon a Remington shell found in defendant's gun undoubtedly it was fired from that gun but whether on the occasion of the shooting no one but defendant knows. That it was found at the point above mentioned was a circumstance before the jury and no doubt was considered by them. It may be inferred that a shell was fired close to where it is found, but that is a mere inference at best. People have been known to pick up shells ejected from their guns and to carry them considerable distances.

When the defendant was arrested, the officers took from his house a 25–20 Winchester rifle. In the barrel there was an empty Remington shell. In the magazine there were both Remington and Winchester cartridges. The bullet found in the body of the deceased was from a Winchester shell. Consequently counsel for the defendant argues: If but two shots were fired at Oswald, the first missing, the second, a Winchester bullet, hitting, the second shot could not have been from

the defendant's gun because of the Remington shell found in the barrel of it. But it is apparent that it is a simple act to replace an empty shell in a gun. If the defendant designedly and cold-bloodedly shot the deceased, and beyond any question the slayer did so shoot him, that man was subtle enough to have made such disposition of the shells used by him as he thought would serve to protect him.

Another bit of evidence presents itself here. Shortly after Hammon went into the schoolhouse Goldie Miller came in and sat near him. Goldie, a girl eleven years of age, previously had gone out to take care of a baby in her charge. While outside engaged in this duty, she heard three shots which came from the east, and the minute she heard them she went into the schoolhouse. This was not far from 9 o'clock. It is clearly possible that the three shots Goldie Miller heard were fired by the defendant; the first two being from Winchester shells, and the third from the Remington shell found in his gun. This is conjectural merely, but the hypothesis upon which counsel for defendant argues with respect to these shells is conjectural also. Summing up all the testimony, if the jury concluded that the shots heard by Goldie Miller were those fired at deceased there was ample to warrant that conclusion. To be sure Oswald spoke of but two shots. But it may be observed that where a man is being fired at by another with deadly intent, receiving a mortal wound at the second shot, it would not be strange if his memory failed to register a third shot. Ordinary observation and common sense say so. Time and again disinterested eye-witnesses to a shooting do not agree upon the number of shots fired. People differ greatly in their powers of observation and the use of those powers—their perceptive faculties differ. (*State* v. *Belland,* 59 Mont., at page 556, 197 Pac. 841.)

Statements made by defendant at the time of his arrest compared with testimony given by him on the trial, contradictory statements by his sons, doubtful testimony given in his behalf by others, and the surrounding circumstances tended strongly

to convince the jury that the defendant is the guilty man. Indeed, it is proper to say that the evidence commanded the verdict the jury found.

3. One ground upon which defendant based his motion for a [5] new trial is newly discovered evidence. Mainly this rests upon the affidavit of his son, Howard Poole. In order to make plain what follows, it is necessary to narrate some of the testimony. Defendant testified that on the eleventh day of July he left the Simpson place and went to his homestead, taking Freddie, his boy, with him. They had two teams, defendant driving one and Freddie the other. The defendant had attached to his wagon two mowers. and Freddie had attached to his wagon a hayrake. After arriving at the homestead they started mowing and continued until about 5 o'clock. They then went to the barn and turned out the horses. After that they went to Howard Poole's wheat-field southeast half a mile.

It is important to note here that, when Freddie went with the officers on Saturday afternoon, July 15, to show them where he and his father had walked in the grain-field on the evening of July 11 he told the officers repeatedly that it was about sundown when Oswald came by the lane gate and he related the movements of Oswald, as well as of his father and himself, at that time to correspond with what Oswald said in his dying statement. Freddie even put his foot into tracks made by him when with his father on Tuesday, to demonstrate the truth of what he was saying. His foot and the tracks corresponded exactly. These tracks were 225 feet north from the lane gate.

It is in evidence that when the county attorney and two deputy sheriffs first interviewed the defendant on July 12 he said he had not been upon that homestead for three weeks until the morning of the 12th. He was asked what difficulty he had had with Joe Oswald on the evening of the 11th and said he had not seen Mr. Oswald nor had any difficulty with him. He was asked when he had brought the machinery to the homestead from the Simpson place, and said, "On the morning of

the 12th,'' and later, being asked the same question, said he brought it over on the morning of the 11th. Asked which statement was correct he replied he brought part of it over on the 11th and part on the 12th. When asked what he had brought over on the morning of the 12th he said he had trailed a mowing machine behind his wagon, and upon the suggestion being made that in such case the tracks of the mower must be visible he grew angry, called the county attorney a kindergarten detective and applied to him indecent language. He admitted taking the 25-20 Winchester with him when he went to his homestead on Tuesday morning, but said he did not shoot that or any other gun that day. After telling of being in his son's wheat-field with Freddie, he said he and Freddie hitched up and started for the Simpson ranch, traveling with a team and wagon. The wagon had a narrow tire. It took about two hours to go to the Simpson place and they arrived there just after sundown; it was not dark when he unhitched and put his team in the barn. After putting the team in the barn, he and Freddie went to the house and got supper. It was light when they were eating supper, and they did not have a lamp. He did not leave the house that night. He said, when he arrived his son Howard was there, remaining twenty minutes. "After I got there, he went away on horseback. I do not know where he went. He came back the next morning. He was not there that night, until the next morning; he had a 25-20 rifle.''

On cross-examination, he said Howard went away with a saddle-horse, started north from the corral right in the rear of the house and traveled in a northerly direction; he rode on a walk. "The next time I saw him was the next morning, about half-past 5. He rode into the place from the south. * * * I know that he had been out all night. I did not inquire of him where he had been. He is seventeen years old. I was busy getting ready, and it did not excite my suspicion or curiosity as to why he had been out all night. Occasionally

he is in the habit of doing that.   I never asked him where he was.''

The defendant testified that on the morning of the 12th he left the Simpson place at about 5 or 5:30 and usually it took him from one and one-half to two hours to travel from that place to the homestead.   Freddie went with him.   They took the same wagon they used the night before.   That same day Mrs. Poole and the three other children went to the homestead, reaching there between 9 and 10 o'clock in the morning. Mrs. Poole went in a wagon with tires three inches wide.

However, three witnesses testified they saw the defendant at his homestead between 5 and 6 o'clock on the morning of July 12, and others made an examination of the road and found no tracks upon it whatever  except those made by the broad wheels of the wagon driven by Mrs. Poole.

Howard Poole testified that his father returned to the Simpson place on July 11 about sundown and then said: ''When my father got back home on the evening of July 11, about sundown, I didn't stay around there.   I left shortly afterward on horseback.''   He went north.   His grain-field was seven miles distant to the southeast.   ''I had a 25–20 rifle with me; I did not have the one that is in evidence here; I don't remember if I went down to the home ranch after that; I don't remember where I went.''   He then said he was gone all night but did not remember where he was.   Being pressed further, he refused to answer, and upon being asked why said: ''It might incriminate me.'' It developed that he did this upon ''the advice of the lawyer.'' This followed: ''Q. When did you get this advice?   A. Right before the trial.   Q. Did you have reason to believe I was going to ask you that question?   A. No.   Q. What made you get the advice then?   You must have thought I knew something about it.   A. I don't see why you are asking me the question now; you never asked me before.''   The advice was obtained from a lawyer or lawyers not connected with the trial.

On the morning of July 12 Howard Poole told Lena Van Riswick, so she testified, that he had been at the Simpson place the entire night of the 11th and that his father and his brother Freddie had spent that night at the homestead.

Ingwald Nagelhouse, who lives two and one-fourth miles west and south of the Simpson place, testified that he saw Howard Poole half an hour before sundown on July 11 about three-quarters of a mile from his (Nagelhouse's) place and then talked with him about fifteen minutes.

According to the testimony of the defendant it took him two hours to make the trip from his homestead to the Simpson place. If he and Freddie saw Oswald at sundown, as Freddie told the officers, defendant could not have arrived at the Simpson place until after 10 o'clock that night. If defendant left the homestead half an hour before sundown, as he said, he could not have arrived before 10 o'clock. If Howard Poole did not leave the Simpson place until twenty minutes after his father arrived it was of course impossible that he could have done the shooting because upon the testimony no conclusion can be arrived at other than that Oswald was shot about 9 o'clock that night. The evidence was sufficient to convince any jury that the defendant and his son Freddie did not go to the Simpson place on the evening of the 11th but on the contrary spent the night at the homestead.

Howard Poole's testimony was adduced after the noon recess on the second day of the trial. Immediately following a recess on that afternoon and while the defendant was on the stand an offer of proof was made by him in which he offered to show that he did not know that Howard Poole would refuse to answer the questions set forth and did not know that such questions were to be asked of Howard, and further offered to prove that he did have knowledge to the effect that Howard "had been accused by the attorney for the defendant of having done the shooting in question, and did not deny the same, which information was conveyed to defendant some time after

court convened on the morning of December 2.'' The trial was concluded on December 5.

Counsel for defendant, in his opening statement to the jury, said in part: ''I believe I can show to your satisfaction, at least, that this shooting was not a case of murder in the first degree, but a case of accidental shooting, pure and simple, and I believe I can show before we are through who did the shooting. * * * That there was a crop of wheat owned, not by the defendant, Poole, but by his son, Howard, not on the land owned by Poole, or rented by him, but, as I understand it, on land rented by Howard Poole, his son, who is somewheres around twenty years of age, or younger. * * * Now we are going to show you, I believe, that that night Mr. Poole carried his rifle from his home that morning, as was his custom to carry his rifle, to his homestead, and left it there that night, and I believe that I can show you the party, other than W. B. Poole, who went to the place that night, and that there was a shot fired at the cattle, and in the darkness, by mistake, Oswald was shot.''

In his concluding argument to the jury Mr. Griggs, after calling attention to the testimony of Howard Poole and referring to that young man's conduct upon the stand, said: ''If I am convinced that some other person than the defendant is the man who is guilty, it is my duty, if possible, to bring that fact out, and let the law deal with that person as it sees fit. I do not say that this was excusable homicide; but I say this, gentlemen, and the facts bear it out: Young Howard Poole, seventeen years of age, had his first—undoubtedly his first—crop of grain. His father came home and told him of the cattle in his field, and of course he, with due haste, rode down there horseback and fired those shots, and in the darkness—I will give him the best of it—shot Joe Oswald by mistake. Maybe he intended to shoot him; I don't know. * * * That testimony, in connection with the testimony of the actions of Howard Poole, discloses without a doubt that the gun which fired the fatal shot in this case was not in the hands of Wilson

B. Poole, but in the hands of his son, Howard, * * * and
when you see how Howard Poole acted on the stand, and re-
fused to tell us what he did on that night, why, gentlemen, it
is not a question of reasonable doubt.''

In his affidavit Howard Poole among other statements told
of his ownership of the field of wheat adjoining defendant's
homestead, of the return of his father to the Simpson place
near sundown, ''the exact time to this affiant being unknown,''
and that either his father or Freddie informed him of having
seen cattle belonging to Oswald in the wheat-field; that he be-
came angered and immediately mounted his saddle-horse and
rode to the homestead; that he carried with him a 25-20 Marlin
rifle and arrived at the homestead ''at just about dark, the
exact time being to this affiant unknown''; that he rode diag-
onally across the same to the wheat-field and upon arriving
there, on account of the darkness, could only distinguish the
forms of several head of cattle in the wheat-field; that he did
not see any person in the wheat-field, or near the cattle, and
did not have any knowledge or information that Oswald or
any other person was within the field or near the cattle; that
in order to frighten the cattle he fired two shots directly over
the heads of the cattle but in so doing he did not intend to
hit the cattle but merely to drive them out of the field. We
interrupt here to observe that while he deposed that he shot
over the heads of the cattle the deceased was hit in the side
or back. Continuing, the affidavit says that immediately after
the two shots were fired he saw what he took to be the form
of a man ''at or near the point toward which he had fired''
and the form then went toward and through the fence to
the south and out into the country road and disappeared; that
the affiant at that time did not know who the man was and
had no knowledge or information that he had shot the man;
and then becoming frightened and without driving the cattle
out of the grain he returned to the house on the homestead
and remained there all night, but being unable to sleep arose
before daylight and returned to the Simpson place about day-

light.    After his father was arrested, believing a conviction impossible, and fearful of the consequence to himself, he decided that under no circumstances would he tell the facts, unless his father should be convicted.    That he did not inform the defendant, or his attorneys or any other person of the shooting until after the trial and conviction of the defendant, when he told the above facts for the first time to Mr. Griggs.

Indulging in the assumption that this affidavit presented a question of newly discovered evidence, it seems plain enough that, when analyzed in connection with the testimony in the case, the known physical facts and the circumstances surrounding the entire transaction, the trial court was warranted in disregarding it.

In *In re Colbert's Estate,* 31 Mont. 461, on page 485, 80 Pac. 248, at page 250 (107 Am. St. Rep. 439, 3 Ann. Cas. 952), this court, speaking through Mr. Commissioner Clayberg, said: "It was the duty of the trial court on the hearing of the motion for a new trial, 'to take into consideration the weight and importance of the new evidence, its bearing in connection with the evidence on the former trial, and even the credibility of the witnesses.' (*State* y. *Stain,* 82 Me. 472, 20 Atl. 72; *Leyson* v. *Davis,* 17 Mont. 220, 293, 31 L. R. A. 429, 42 Pac. 775.)    But, again, a motion for a new trial should not be granted on newly discovered evidence unless such evidence makes it clearly probable that it will produce a different result on the retrial.    (*State* v. *Hardee,* 28 Mont. 18, 72 Pac. 39.)"

Conceding for the purposes of the discussion that the offered evidence was newly discovered within the rule, it must be borne in mind that the trial judge observed the demeanor of all the witnesses who testified in this case, including Howard Poole. If we were merely in doubt as to whether the "newly discovered" evidence was material we should not disturb the action of the lower court which thus exercised its discretion in passing upon the weight and materiality of this offered evidence; but, as is above indicated, we are not in any doubt whatsoever.

In passing on a motion for a new trial, the lower court is called upon to exercise a sound legal discretion. In the absence of a clear showing of error in this regard, this court will not interfere. (*State* v. *Mott*, 29 Mont. 292, 74 Pac. 728.) The defendant has had a fair and impartial trial. The court was right in overruling the motion.

The judgment is affirmed.

*Affirmed.*

Associate Justices Cooper, Holloway, Galen and Stark concur.